**SHEEHAN v. NEW YORK, N. H. & H. R. CO.**
**No. 49.**

Circuit Court of Appeals, Second Circuit.
Dec. 20, 1937.

E. R. Brumley, of New York City, for appellant.

Thomas J. O'Neill, of New York City, for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

This is an appeal by the New York, New Haven & Hartford Railroad Company from a judgment for the plaintiff in an action brought under the Federal Employers' Liability Act, 45 U.S.C.A. c. 2, § 51 et seq., to recover damages for the death of John J. Sheehan, the plaintiff's intestate. In the early morning of September 27, 1935, he was the engineer operating a freight train which ran into the rear of another freight stalled on the Saugatuck River bridge at Westport, Conn. In the collision he sustained fatal injuries. The trial resulted in a verdict for the plaintiff for $100,000, which the court reduced to $40,000. The main question presented by the appeal is whether the trial court committed error in overruling the defendant's motion for a directed verdict on the ground that the proof showed that the deceased's own negligence was the primary cause of his death.

The appellant concedes that there was ample proof of negligence on the part of the defendant's servants employed upon the stalled train. Its flagman neglected to go back along the track a sufficient distance to protect by signals the rear of his train; its engineer neglected to sound the required whistle signal for the flagman to protect the train; and its conductor neglected to see that the flagman performed his duty. Each violated a rule of the railroad. The defense is that Sheehan was the primary cause of his own death because he ran through two automatic signals whose warnings, had he been attentive to them, would have enabled him to avoid the collision. The appellee concedes that, if these facts were established, the plaintiff cannot recover. On this issue the burden of proof is upon the defendant. Kierce v. Central Vermont Ry., 2 Cir., 79 F.2d 198, 202, certiorari denied, 296 U.S. 629, 56 S.Ct. 152, 80 L.Ed. 447. We must examine the evidence.

The automatic signals are referred to as 12 F and 16 F. The former was 1,045 feet west of the rear car of the stalled train; 16 F was about 5,100 feet west of 12 F. If the block signal system was in operating order, the presence of a train upon the bridge would cause 12 F to show double red lights, meaning "danger," and requiring an approaching train to stop, and would cause 16 F to show red and yellow, meaning "caution," and requiring the engineer passing it to have his train under such control as to be able to come to a stop before passing 12 F if that should be showing double red when he approached it. The stalled train came to rest on the bridge about 12:05 a. m., and this was about 15 minutes before the accident. Hence, when Sheehan's train approached signal 16 F about two minutes before the collision, that signal was at caution and 12 F was at danger, provided the system was functioning properly. No eyewitness testified to what signal indication was shown by 16 F as Sheehan's train approached on track 2. It was testified without contradiction that when the stalled train passed the signals both were showing green, that is, a "clear" track; which indicates that the signals were in proper order at that time. It was testified without contradiction by Geary, a brakeman in the second head motor or electric engine of Sheehan's train, that the emergency brakes were applied when the head motor reached a section shanty 930 feet west of signal 12 F, and he looked out and saw that 12 F was showing double red; which was the proper signal for it to show with the stalled train on the bridge.

There is a dispute as to when signal 12 F first becomes visible to an approaching train on track 2. Numerous witnesses for the defendant, three of them entirely disinterested and not employees of the railroad, said that 12 F is visible from a point at least 2,400 feet to the west and continues visible, except for a blind spot of about 150 feet between catenaries 569 and 570 caused by the roof of the section shanty. Plaintiff's witness Stamp, who had not been in the defendant's employ nor operated a locomotive since 1921 and whose testimony was in many respects unreliable, testified that 12 F could not be seen until the section house, 930 feet west of it, was passed. In our view, the dispute is immaterial, for reasons which will appear. If 12 F was visible at 2,400 feet, then Sheehan was negligent in not applying his brakes at that point. He would have had some 3,400 feet within which to stop his train before reaching the bridge, and the testimony is undisputed that he could have stopped within 3,000 feet. On the other hand, if 12 F was first visible at 930 feet to the west, he had not sufficiently reduced his speed to avoid running through the danger signal, as he was required to do if 16 F was at caution. We therefore resume consideration of the evidence as to 16 F.

In August, 1935, 16 F was inspected under train operation by William Frederick, employed by the railroad as a signal maintainer. He testified it was found to be all right. He also made the customary "dropaway" tests of both signals on September 20th and again on the 26th, the very day before the accident, and found them in perfect operating condition. Stuart, the signal maintenance foreman, arrived at the scene of the accident about 1:05 a. m. September 27th. He found the lights out on signal 12 F, the electric power having gone off as a result of the collision, and the blades in stop position. When the power came on at 1:36, the double red lights were again displayed on this signal. Stuart and Morrison, the signal engineer, walked back to see the condition of 16 F; they found that also showing double red lights, as it should, since the rear of Sheehan's train extended into the block west of 12 F. Stuart sealed the locks to the signals so that they could not be tampered with. The control wires and cables were damaged by the collision; after the damage was repaired on the morning of September 28th, the signal system was tested and found to operate perfectly. Morrison testified that a signal has been known to give a false indication of a clear track, but that it happens on an average of once in two million operations; and that the mechanical or electrical defect which caused such a false operation of the signal has always been discoverable afterwards. No defect of any kind in 16 F was discovered after the accident.

The evidence, as above summarized, satisfies us that the defendant carried the burden of proving that 16 F operated properly on the night in question, that Sheehan disregarded its indication of caution and did not have his train under control so that he could stop when the danger signal of 12 F became visible (whenever that was), and that this failure was the primary cause of the collision. To permit the jury to find that 16 F gave a false "clear" indication when Sheehan approached it, because once in two million times a signal may fail, would allow them to indulge in pure speculation. It is true, as argued, that a dead plaintiff is entitled to the benefit of a presumption of freedom from contributory negligence; but that presumption was overcome by proof that the automatic signals, which operate with such extraordinary accuracy as the testimony shows, were in order shortly before and shortly after the accident. On these matters there was no dispute in the testimony. In this respect the case is distinguishable from Kierce v. Central Vermont Ry., 2 Cir., 79 F.2d 198. There one witness, though of doubtful credibility, testified that the signal indicated a clear track; others said it was in "stop" position. So a question of credibility was presented for the jury's determination. Here no witness has testified to the signal indication of 16 F when Sheehan's train approached; and the circumstantial evidence that it was displaying red and yellow lights is overwhelming. Accordingly, the defendant's motion for a directed verdict on the ground that Sheehan's negligence was the primary cause of his death should have been granted.

Since the trial judge reserved decision on the motion until after verdict, we may reverse and direct a judgment of dismissal on the merits. Baltimore & Carolina Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636. It is so ordered.