Maureen A. MONTELLIER, as Administratrix of the Goods, Chattels and Credits of Norman J. Montellier, deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 19699.

United States District Court
E. D. New York.

Feb. 5, 1962.

388

Duer & Taylor, John S. Chapman, Arthur McInerney, of counsel, for plaintiff.

Joseph P. Hoey, U. S. Atty., Eastern District of New York, James M. Fitzsimons, Asst. U. S. Atty., of counsel, for defendant.

ZAVATT, District Judge.

At 12:30 on the morning of June 27th, 1958 a United States Air Force jet tanker airplane, designated as a KC–135A, (hereinafter referred to as KC–135,) took off from Westover Air Force Base, Massachusetts on what was hoped to be a record-breaking, round-trip, non-stop, non-refueling flight. The gross weight of the plane as its brakes were released for the beginning of the takeoff ground run was approximately 290,500 pounds including approximately 184,500 pounds of fuel. Although it became airborne, it struck treetops (16 ft. above runway level) approximately 4,050 feet beyond and in a line in continuation of the takeoff end of the runway; struck another tree 700 feet beyond; severed six high-tension wires (below runway level) each approximately ¾″ in diameter and burst into a ball of fire; the left wing tip struck the ground at the airport side of the Massachusetts Turnpike; the plane cartwheeled across the Turnpike and came to rest, a complete wreck, on the opposite side. All on board died instantly.

Fifteen persons were aboard the ill-fated plane—seven crew members, two National Aeronautics Administration representatives and six representatives of news gathering agencies, i. e., Associated Press, News World, Time Magazine, Boston Herald and United Press International. Norman J. Montellier, plaintiff's intestate, was aboard as representative of United Press International. He was survived by his widow, Maureen A. Montellier, and two infant children—Kathleen, born April 8, 1949, and Peter, born August 21, 1950—all of whom were residents of this district and citizens of New York State on June 27th, 1958 and

at all times thereafter to and including the time when the present action was instituted.

The plaintiff has brought this action, in her own behalf and in behalf of said children, under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674 and the Massachusetts Death Act, Ann.Laws of Mass., Ch. 229, § 2C, in which she seeks to recover damages in the sum of $350,000. The Government denies liability and has raised the following threshold questions of law:

(1) That the plaintiff, not having been appointed administratrix by a Massachusetts court, but rather, by the Surrogate's Court of Queens County, New York, is not a proper party plaintiff; that she lacks legal capacity to bring this action founded upon the Massachusetts Death Act;

(2) That the decision that the flight be made and the execution thereof were made by a federal agency or an employee of the Government in pursuance of a discretionary function and that, therefore, the plaintiff may not recover under the Federal Tort Claims Act; that everything relating to this flight comes within the exceptions to the Act specified in 28 U.S.C. § 2680(a);

(3) That Norman Montellier assumed all risks of the flight by boarding the plane and by executing and delivering a release running to the Government; that these acts constitute a complete bar to this action, even assuming that the plaintiff has the legal capacity to sue and that the Government would otherwise be liable.

(4) The Government contends, further, that Norman Montellier was a mere licensee, not an invitee and, therefore, that the plaintiff may recover only upon proof of gross or wanton negligence.

(5) At the trial, the Government contended that, even if the plaintiff were entitled to recover, damages must be limited to $20,000 by the terms of the Massachusetts Death Act. In its post-trial memorandum, the Government appears to have abandoned this contention.

*Plaintiff Has Legal Capacity To Sue*

The complaint was filed April 21, 1959; issue was joined July 26, 1959. The complaint alleged that this court has jurisdiction of the subject matter (paragraph "First";) that the plaintiff is the duly appointed administratrix of the goods, chattels and credits of Norman J. Montellier, deceased (paragraph "Second";) that the plaintiff has the right to bring this action (paragraph "Sixth".) The answer merely denied "knowledge or information sufficient to form a belief" as to plaintiff's allegations in paragraph "Second" of the complaint. As to her allegations that the court has jurisdiction and that she has the right to bring this action the defendant pleaded that "The allegations set forth in paragraphs of the complaint designated 'First' and 'Sixth' set forth a question of law and is submitted to the court for determination." Following a pre-trial conference on December 7, 1960, a pre-trial order (approved in writing as to form and substance by the attorneys for all parties) was made. Among other things, it contains the stipulation of the attorneys that "Plaintiff is the duly qualified administratrix of the goods, chattels and credits of Norman J. Montellier, deceased, and is authorized to proceed in the capacity in which she sues." This stipulation was read into the record, without objection, on the opening day of the trial. The matter of jurisdiction or capacity to sue in this action was never again raised during the eighteen full days of trial between May 1st and June 19th, 1961. Not until September 15, 1961, when the defendant filed its post-trial memorandum, were these questions raised.

To countenance such tactics would make a mockery of Rule 16 of the Rules of Civil Procedure, 28 U.S.C., and federal pre-trial practice, the purpose of which is to define the claims and defenses of the parties in order to eliminate unnecessary proof and issues, lessen the opportunities for surprise and thereby expedite the trial. Rosden v. Leuthold, 107 U.S.App.D.C. 89, 274 F.2d 747

(1960). Further, the defendant ignores Rule 9 of the Rules of Civil Procedure. A plaintiff is not required to aver capacity to sue. One who desires to raise the issue must do so by specific averment supported by particulars within the pleader's knowledge.[1] This the defendant failed to do. The answer to paragraph "Sixth" of the complaint did not satisfy the requirements of Rule 9(a) and, therefore, failed to raise an issue as to plaintiff's capacity to sue. Kucharski v. Pope & Talbot, Inc., 4 F.R.D. 208 (S.D.N.Y.1944). Failure to comply with Rule 9(a) precludes the defendant from raising the issue at the conclusion of the trial. Waldrip v. Liberty Mutual Ins. Co., 11 F.R.D. 426 (W.D.La.1951); Coburn v. Coleman, 75 F.Supp. 107 (W. D.S.C.1947). Failure to raise this issue by motion or answer constitutes a waiver. Coburn, v. Coleman, supra; Trounstine v. Bauer, Pogue & Co., 144 F.2d 379 (2nd Cir. 1944), cert. denied 323 U.S. 777, 65 S.Ct. 190, 89 L.Ed. 621 (1944).

■ The defendant also ignores Rule 17(b), Federal Rules of Civil Procedure. Here is a specific rule precisely on point which makes it crystal clear that the law of Massachusetts, as to what representative of a decedent may sue in the courts of that Commonwealth, has no bearing upon the capacity of the plaintiff to sue the defendant in this court in her representative capacity as administratrix appointed pursuant to the law of New York State, in which this district court is held.[2] Under the law of New York, an administratrix appointed in New York has the capacity to sue in New York under a foreign death statute, even though that statute requires that, if such an action is brought in the state where death occurred, it may be brought only by an administratrix qualified under the law of that state. Meehan v. Central Railroad Company of New Jersey, 181 F. Supp. 594, 606 (S.D.N.Y.1960); Jongebloed v. Erie Railroad, 180 Misc. 893, 42 N.Y.S.2d 260 (1943), aff'd, 266 App. Div. 960, 44 N.Y.S.2d 681 (1943).

I conclude that the plaintiff has capacity to sue the defendant in this action in this court.

## 28 U.S.C. § 2680(a) Does Not Absolve the Government From Liability.

28 U.S.C. § 2680(a) provides that the Federal Tort Claims Act does not apply to "Any claim based upon an act or omission of an employee of the government * * * based upon the exercise or performance or the failure to exercise or perform a discretionary duty or function on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

■ Prior to the decision in Indian Towing Co. v. United States, 350 U.S.

---

1. "(a) Capacity. It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of an organized association of persons that is made a party, except to the extent required to show the jurisdiction of the court. When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge." Fed.R.Civ.P. 9(a).

2. "(b) Capacity to Sue or Be Sued. The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, and (2) that the capacity of a receiver appointed by a court of the United States to sue or be sued in a court of the United States is governed by Title 28, U.S.C. §§ 754 and 959(a). As amended Dec. 27, 1946, and Dec. 29, 1948, effective Oct. 20, 1949." Fed.R.Civ.P. 17(b).

61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the precise application of section 2680(a) was described as an area pervaded by judicial inconsistency and confusion. Note, 66 Harv.L.Rev. 488 (1953). The legislative history of the section has been described as being of little or no help in determining its application. Hernandez v. United States, 112 F.Supp. 369 (D. Hawaii 1953). However, in the lower federal courts a distinct line of cases developed supporting the view that, where simple negligence is the gravamen of the complaint, there is a point at which discretion ceases and liability for negligent conduct ensues. Thus, while the decision to engage in a particular activity may not be actionable, although negligent, the negligent conduct of the activity itself is actionable. In United States v. Gray, 199 F.2d 239 (10th Cir. 1952), in which a mental patient in the absence of her guard hurled herself through a window and injured herself, the court pointed out that although the hospital in the exercise of its discretion could have refused to admit her as a patient, once it chose to admit her it was bound to exercise due care for her protection. And in Somerset Seafood Co. v. United States, 193 F.2d 631 (4th Cir. 1951), the court stated that, even if the marking of a wreck at sea was a matter of discretion, nevertheless liability existed for negligence in the actual marking once the decision to mark had been made. Further support for this analysis may be found in the district courts. E. g., Hernandez v. United States, 112 F.Supp. 369 (D.Hawaii 1953); Worley v. United States, 119 F.Supp. 719 (D.Ore.1952); Toledo v. United States, 95 F.Supp. 838 (D.Puerto Rico 1951).

Language in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), possibly suggested that the discretionary function exemption might perhaps be somewhat larger than the above cases indicated. However, prior to Indian Towing, supra, the lower courts did not so interpret the Dalehite opinion. In Pierce v. United States, 142 F.Supp. 721 (E.D.Tenn.1955), aff'd, 235 F.2d 466

(6th Cir. 1956), in which the defense relied on Dalehite, the court held that, once the decision to construct an electrical substation and transmit power to it had been made, all discretion had been exercised. All that remained was for the Government, its agents and employees to exercise due care in executing the decision. Similarly, in Penn. R. R. Co. v. United States, 124 F.Supp. 52 (D.N.J. 1954), the decision of the Coast Guard to suspend certain restrictions on the loading of explosives was not actionable since it was made in the exercise of a discretionary function. But the negligence of the Coast Guard loading supervisory detail was actionable on the ground that they had no discretion to exercise, their only task being the performance of their duty. See also White v. United States, 211 F.2d 79, 82 (9th Cir. 1954); Guy F. Atkinson v. Merritt, Chapman & Scott, 126 F.Supp. 406 (N.D.Cal.1954). The soundness of lower court interpretations of the Dalehite case was made explicit in Indian Towing, supra. That case involved negligence by the Government in the operation of a lighthouse. The court pointed out that the Government need not undertake to provide lighthouse service, but having done so it must act with due care. Thus the demarcation separating liability from non-liability is that drawn between the planning and operational levels of governmental function. The court further stated that "the broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable * * *." Since Indian Towing, the courts have hewn to the distinction between planning and operations implicit in that decision. Thus, in American Exchange Bank v. United States, 257 F.2d 938 (7th Cir. 1958), in which the plaintiff suffered injury because of the lack of a railing on the steps of a post office, the failure to provide the rail was held to be on the level of operations and liability ensued. There the planning level was described

as the decision to erect the post office. To the same effect, Foster v. United States, 183 F.Supp. 524 (D.N.M.1959), aff'd, 280 F.2d 431 (10th Cir. 1961). Similarly in Jemison v. The Duplex, 163 F.Supp. 947 (S.D.Ala.1957), involving a wharf owner's suit for damages to its wharves caused by a Government contractor's dredging below the level of the wharves, the court held the Government to be negligent in defectively planning the operation. Discretion was exercised when it was decided to deepen the channel in question, but the engineer's negligence in drawing the plans was on the operational level. To the same effect, McCormick v. United States, 159 F.Supp. 920 (D.Minn.1958).

 Clearly the reasoning of this entire line of cases is applicable to the case at hand. While no liability can be predicated on the decision to make the flight, this being on the planning level of governmental function and thus exempt under § 2680(a), clearly once this decision was made there was no further room for the exercise of discretion. All that remained was the duty of the Government and its employees to use due care in its execution. I conclude that 28 U.S.C. § 2680(a) is not a bar to this action.

*The Release Executed by the Decedent is Not a bar to This Action*

On the day of and shortly before the takeoff, Norman Montellier executed and delivered at Westover Air Force Base in Massachusetts a release as follows:

"RELEASE

(Reference AFR 76-6)

Westover AFB Mass
(Place)

26 June 1958
(Date)

"KNOW ALL MEN BY THESE PRESENTS: WHEREBY I Norman Montellier am about to take a flight or flights as a passenger in certain Army, Navy, and/or Air Force aircraft on 26, 27 June 1958; and whereas I am doing so entirely upon my own initiative, risk, and responsibility; now, therefore, in consideration of the permission extended to me by the United States, through its officers and agents to take said flight or flights, I do hereby, for myself, my heirs, executors, and administrators, remiss, release and forever discharge the Government of the United States and all its officers, agents, and employees, acting officially or otherwise, from any and all claims, demands, actions, or causes of action, on account of my death or on account of any injury to me or my property which may occur from any cause during said flight or flights or continuances ther[e]of, as well as all ground and flight operations incident thereto. I did not receive formal training in altitude indoctrination; however, I have been thoroughly briefed on use of the equipment necessary for high altitude flight, as well as possible effects of such flights. I fully understand that I am waiving altitude indoctrination.

"/S/ Norman J. Montellier
(Signature)

"/S/ Thomas B. Ulaori
(Witness)

/S/ Wilbur W. Wiley
(Witness)

"Mrs. Maureen Montellier
(Name of person to be notified in emergency)

62-62 Woodhaven Blvd.,

Rego Park 74, New York
(Address of person to be notified in emergency)
(Hickory 6-6343)"

The defendant contends, in effect, that this release is a bar to this action; that plaintiff is bound by the release because Montellier—had he survived and sued to recover for personal injuries—would have been bound by his release. In other words, defendant contends that the rights of the plaintiff are derivative; that they derive from Montellier's rights and that since the release would have barred a suit by him it bars this suit. A consideration of this point requires

an understanding of the rights granted by the Massachusetts Death Act and a determination as to what law applies, i. e., the law of Massachusetts or general federal law, if any.

Not all state death acts are the same. Some grant to survivors of a decedent a derivative right; some grant them a right that is independent of the right of the decedent—had he survived and sued to recover for personal injuries; some provide for compensatory damages, either limited or unlimited as to amount; others limit the amount of recovery and are punitive in nature rather than compensatory.

The first death act was Lord Campbell's Act, Stat. 9 & 10 Vict.Ch. 93 [3]. It created a derivative right to damages for wrongful death. New York created this type of right for wrongful death. It too is derivative.[4] The Massachusetts Death Act in effect on the date of death of Montellier, Mass.Ann.Laws 1955, ch. 229, was not derivative, e. g., Oliveria v. Oliveria, 305 Mass. 297, 301,

25 N.E.2d 766 (1940); Shapiro v. Lyon, 254 Mass. 110, 49 N.E. 543 (1925). It contained specific sections relating to "Damages for Death from a Defective Way," § 1; "Damages for Death by Negligence, etc., of Common Carrier," §§ 2 and 2A; "Damages for Death of Employee by Negligence, etc., of Employer, etc.," § 2B, and "Damages for Death by Negligence, etc.; General Provisions," § 2C. This case falls within § 2C [5] because the law of the state where the alleged act of negligence or the alleged wrongful act or omission occurred is applicable in Federal Tort Claims Act suits, 28 U.S.C. § 1346(b), which makes the Government liable for such acts or omissions "if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

It was settled law in Massachusetts that a release signed and delivered by a decedent was of no effect against plaintiffs in an action brought under the Massachusetts Death Act in effect prior

---

3. "Whereas no action at law is now maintainable against a person who by his wrongful act, neglect, or default may have caused death of another person, and it is oftentimes right and expedient that the wrongdoer in such case should be answerable in damages for the injury so caused by him: Be it therefore enacted by the Queen's most excellent Majesty, by and with the advice and consent of the lords spiritual and temporal, and commons, in this present Parliament assembled, and by the authority of the same, that whensoever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect, or default *is such as would* (if *death had not ensued) have entitled the party injured to maintain an action* and recover damages in respect thereof, then and in every such case the person who would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony. (Emphasis supplied.)" Lord Campbell's Act, Stat. 9 & 10, Vict.Ch. 93.

4. New York Decedent Estate Law, McKinney's Consol.Laws, c. 13, § 130.

5. THE MASSACHUSETTS DEATH ACT (Mass.Ann.Laws, 1955) Chapter 229
"§ 2C. Damages for Death by Negligence, etc.; General Provisions.
"Except as provided in sections one, two and two A, a person who by his negligence or by his wilful, wanton or reckless act, or by the negligence or wilful, wanton or reckless act of his agents or servants while engaged in his business, causes the death of a person in the exercise of due care, who is not in his employment or service, shall be liable in damages in the sum of not less than two thousand nor more than twenty thousand dollars, to be assessed with reference to the degree of his culpability or of that of his agents or servants, to be recovered in an action of tort, commenced, except as provided by sections four and ten of chapter two hundred and sixty, within two years after the injury which caused the death by the executor or administrator of the deceased, to be distributed as provided in section one. (1897, 416; 1898, 565; RL 171, § 2; 1907, 375; 1922, 439; 1925, 346, § 9; 1946, 614, § 1; 1949, 427, § 3; 1951, 250.)"

to January 1, 1959.[6] Oliveria v. Oliveria, supra; Wall v. Massachusetts, etc., Ry., 229 Mass. 506, 118 N.E. 864 (1918); Doyle v. Fitchburg Ry., 162 Mass. 66, 37 N.E. 770, 25 L.R.A. 157 (1894). The rationale of these cases is that, since that Death Act created a right in the survivors which did not arise until the wrongful death, the deceased had no power to barter it away and his execution and delivery of a release was nugatory as to his survivors.[7]

◼ The court concludes that the release executed and delivered by the decedent is not a bar to this action nor is it a valid defense.

*Decedent Did Not Assume Risks of the Flight by Executing the Release.*

The defendant pleaded as affirmative defenses the contributory negligence of the decedent and that the decedent "assumed the risks of the happening of the alleged accident" (paragraphs "Fourth" and "Fifth" of the answer). At the pretrial conference defendant withdrew the defense of contributory negligence. This withdrawal is incorporated in the pretrial order dated December 7, 1960 which was approved as to form and substance by the attorneys of both parties and is noted in the record. At the trial no evidence was offered to establish contributory negligence, nor did the defendant argue that the release was evidence of assumption of risk in the sense of contributory negligence. Nevertheless, in its post-trial memorandum the defendant argues assumption of risk and contributory negligence are synonymous; that the Massachusetts Death Act conditions recovery by this plaintiff on "the exercise of due care" by decedent; that despite the non-derivative nature of plaintiff's claim she is foreclosed from recovering because decedent assumed the risks of this accident.

which assumption is tantamount to contributory negligence which, in turn, was a failure by the decedent to exercise the due care required by the Act.

◼ Assumption of risk is a term which has been surrounded by much confusion because it has been used by the courts in at least four different senses and the distinctions are seldom made clear. Since defendant here has not specified the exact sense in which it is invoking the defense, the court will consider all of them. In its simplest sense the doctrine means that plaintiff has given his express consent to relieve the defendant of an obligation of conduct toward him and has agreed to take his chance of injury from a known risk. A second meaning is that plaintiff, with knowledge of the risk, has entered voluntarily into some relation with the defendant which necessarily involves danger of harm from a known risk, and thus impliedly consents to take his own chances. In a third sense, the plaintiff may act entirely reasonably but, by voluntarily encountering a known risk which defendant has negligently allowed to come into being, he relieves the defendant of liability. In the fourth sense of assumption of risk, plaintiff's conduct is itself unreasonable and amounts to and is the equivalent of contributory negligence. Prosser, Torts, 303–04 (1955).

At the outset we are presented with the question of whether or not the section of the Massachusetts Death Act requiring the decedent to exercise due care as a condition of recovery allows the raising of an assumption of risk defense. The Massachusetts courts do not appear to have considered the question directly, although dictum in Hall v. Henry Thayer & Co., 225 Mass. 151, 113 N.E. 644 (1916) suggests that it may. Were the

---

6. The Act was amended by Mass.Ann.Laws of 1958, Ch. 229, § 2, effective January 1, 1959.

7. In death actions under the New York derivative Wrongful Death Act, such a release is not a bar, per se. Its effect

may depend upon the degree of negligence which caused the death and the status of the decedent. See Rogow v. United States, 173 F.Supp. 547 (S.D.N.Y. 1959); Friedman v. Lockheed, et al., 138 F.Supp. 530 (E.D.N.Y.1956).

Massachusetts courts to consider the point directly, insofar as assumption of risk means an express assumption of risk founded on an agreement between the parties, it appears probable that, in light of the Massachusetts cases holding a release signed by the decedent in his lifetime to be no defense in a wrongful death action, they would reject it. Oliveria v. Oliveria, supra; Wall v. Massachusetts N. St. Ry. Co., supra; Doyle v. Fitchburg Ry., supra. In Friedman v. Lockheed Aircraft Corp., 138 F.Supp. 530, 536 (E.D.N.Y.1956), a case involving a release almost the exact duplicate of the one at hand, the court rejected the contention that the execution of the release by decedent amounted to an implied assumption of all risks incident to his ride in an ill-fated jet fighter plane.

To the extent that assumption of risk is used in the sense that decedent's conduct in encountering a known risk was itself unreasonable and amounted to contributory negligence, the court finds that the defense of assumption of risk was waived by defendant at the pre-trial conference and cannot be revivified at this late date. To hold otherwise would allow the utilization of finespun niceties of pleading in such a way as to mislead both the court and opposing counsel and as such must be disapproved.

Whether or not assumption of risk in its second and third meanings may be raised under the provision of the Massachusetts Death Act requiring the decedent to have exercised due care as a condition precedent to recovery in a wrongful death action, presents a closer question. Weighed against the statements by the Massachusetts courts to the effect the Massachusetts Death Act is non-derivative we must balance the fact that insofar as contributory negligence is concerned the act is clearly derivative Compare Oliveria v. Oliveria, supra, with Sullivan v. Hamacher, 339 Mass. 190, 158 N.E.2d 301 (1959). The court doubts that assumption of risk, in the sense that one may act entirely reasonably but nevertheless is barred from re-

covering due to his voluntary encounter with a known risk, could be raised under Ann.Laws of Mass. c. 231 § 85 since reasonable action necessarily precludes the absence of due care. If, however, the Massachusetts court were to allow assumption of risk as a defense in this type of case it would be an affirmative defense not only to be pleaded but also proved by the defendant, since Ann.Laws of Mass. c. 231, § 85 provides that lack of due care, the generic term which would have to be found to subsume assumption of risk, is to be so established. Sullivan v. Hamacher, supra. In the absence of such pleading and proof the decedent "shall be presumed to have been in the exercise of due care." Both assumption of risk and contributory negligence present questions of fact to be resolved by the trier of fact. Hall v. Henry Thayer & Co., 225 Mass. 151, 113 N.E. 644 (1916).

The major factor in determining the existence of assumption of risk is the state of knowledge of the decedent. Ordinarily one does not assume risks of which he is ignorant. Furthermore, in order to assume the risk of a particular act or condition one must know and appreciate the danger itself, not just the facts which constitute it. Generally the state of decedent's knowledge is a question for the trier of fact. Prosser, Torts 309–10 (1955). In determining the state of decedent's knowledge it is especially relevant to inquire into the information he received from the Government, since this would appear to be his main, if not the only source from which he could learn of any dangers involved. Montellier received his first knowledge of the flight on June 26th, 1958 when his superior at United Press International, Mr. Donald Dillon, an editor in the New York office, received a call from his superior to the effect that the flight was going to occur and that the man UPI had originally planned to send, one Joe Morgan, would be unable to go. In the course of this conversation Dillon's superior asked him if he had anyone to replace Morgan. Dillon

then asked Montellier, who was sitting at the desk across from him, if he was interested. Montellier told Dillon that he'd like to "find out about it." Montellier then walked across the room and spoke to Morgan, came back to Dillon and told him that he was interested, but would like to check with his wife. Sometime later in the day Montellier told Dillon that he would go and Dillon passed this information on to his superior. Thus it appears that before he arrived at Westover Montellier can have known little more than that the flight would occur.

Montellier's only opportunity to be apprised of any particular risks involved in the handling of the plane was on June 26th, 1958 at Westover Air Force Base. The members of the press began to arrive at Westover at about midday and continued to arrive throughout the remainder of the day. In addition to dining at the officers' mess (there is no evidence as to what happened at the officers' mess) the newsmen attended three briefing sessions. If Montellier was to receive any knowledge of any of the particular risks of this flight it would seem that it would have to be presented at these briefing sessions, if at all. The first briefing session that the newsmen attended was a personal equipment briefing, held only for the members of the press. It does not appear whether or not the men designated as "timers" also attended. At this briefing the newsmen were issued and fitted with helmets, oxygen masks and parachutes and instructed as to their use. The mere issuance of such equipment can in no way have apprised Montellier of the particular dangers involved in the improper handling of a KC135 under novel conditions. Rather, Montellier might well infer that the Air Force was taking special precautions for his safety and that on that basis he could with confidence place his well-being in the hands of the Air Force, its men and its equipment. From eight to eight-thirty on the evening of June 26th the newsmen, together with the crews, staff officers and others, attended the final crew briefing. The crews received the briefing as if the reporters were not present. However, the reporters could see and hear the entire session. At this session the takeoff and flight data, including weight, weather, routing, landing field diagrams and flap setting, were discussed and pertinent slides were projected on a screen. Communication and navigation information was also discussed. The crews were asked to see if they had checked the most recent bulletins in the flight safety book, which contains data on the plane's functioning and performance. Those present were also told that no flight record is worth losing a plane and that safety was a prime consideration. Nothing presented at this session was of a nature which would bring any sense of particular danger to the mind of one of ordinary sensibilities. Rather, the stress on safety and careful planning would assure one going on the mission of the care and precaution exercised in his behalf.

This feeling of confidence which the Air Force engendered in those to be on board was further strengthened at the final "news story" briefing held only for the press sometime after the final crew briefing. The major part of this session was devoted to a discussion of the contents of the press kit prepared by the Office of Information, Headquarters Eighth Air Force, Westover Air Force Base and given to all the newsmen. The materials in this kit placed great stress on past Air Force accomplishment and expected Air Force achievements. Nowhere therein can be found any intimation of anticipated danger. Incorporated therein were biographies of General Sweeney, Commander of the Eighth Air Force, and General Saunders. Both of these men appear to be credits to their country. Nothing in their records would lead to a conclusion other than that these men knew their jobs and had records of proven accomplishment. This press release also presents us with the fine record of the Eighth Air Force in making long distance flights. To their credit are the first non-stop flight around the world by

a combat aircraft, March 2, 1949; the then longest jet flight on record (21,163 miles) November 17–19, 1954; the first non-stop around the world flight by jet aircraft, January 18, 1957; and other outstanding flights of a similar nature. It is reasonable to conclude that Montellier, on being presented with this record of proven accomplishment, would feel assured that the flight involved no unusual peril. Indeed, one part of this press kit is entitled "Existing Records and New Records to be Accomplished." Nor would any knowledge of risk seem to flow from the fact that the flight was to be made on the KC–135, for this type of aircraft also presented an outstanding record in flights of this type, which were enumerated in the press kit. This type of plane, already in service with regular Strategic Air Force units, had won the 1958 Harmon Trophy for one of its flights. To the credit of the KC–135, prior to the accident date, were non-stop flights without refueling between Westover Air Force Base and Buenos Aires and return, November 12, 1957, a distance of 6,350 miles; a non-stop flight which set a speed record between Tokyo and Washington, D. C., April 7, 1958, a distance of 6,769 miles, in which the plane continued non-stop to the Azores, for a total distance of 10,233 miles. On June 13, 1958, a KC–135 set an unofficial coast to coast speed record of three hours, forty-two minutes, forty-five seconds. On being presented with a listing of these fine achievements one would expect the decedent's reaction to have been confidence in his safety in an aircraft to be flown by men of the Eighth Air Force. The balance of the "news story briefing" was devoted to the signing of the release referred to supra. It should be noted that we are here dealing with the release only insofar as it may have conveyed knowledge of any particular dangers to the decedent. The only specific risks which the release mentions are those attendant upon high altitude flying which are in no way relevant here since the plane was never more than one hundred feet above the ground, if that high. It cannot be said, in light of the general impression of careful planning and precaution created by the Air Force, that the mere signing of the release or anything that may have been said with reference thereto was sufficient to convey knowledge of the particular risks involved in the fatal take-off.

A survey of recent aviation accident cases establishes that the defense of assumption of risk now receives only a limited acceptance. It is by now well settled that merely by boarding the plane commercial airline passengers no longer assent to encountering a known danger either with respect to the plane itself or its operation. Urban v. Frontier Airlines, 139 F.Supp. 288 (D.Wyo.1956); Lopez v. Resort Airlines, 18 F.R.D. 37 (S.D.N.Y.1955). In the area of passengers on private planes a similar result has been reached. Boise Payette Lumber Co. v. Larsen, 214 F.2d 373, 46 A.L.R. 2d 1038 (9th Cir. 1954). There the defense was not available in an accident caused by the pilot's inadequate night flying training, since the decedent did not know the pilot prior to the day of the accident and had no knowledge whatsoever as to his lack of training. In Bruce v. O'Neal Flying Service, 231 N.C. 181, 56 S.E.2d 560, 12 A.L.R.2d 647 (1949) involving a stunt plane at an air show the court, in rejecting assumption of risk as a defense, found that the evidence showed the plane in which the demonstration took place to have been fit for the purpose and the stunt maneuver to have been normal and safe in the hands of a careful pilot. The only recent case supporting assumption of risk as a defense involved the very different situation of an instructor in a dual control plane injured when a student pilot with only thirty-five hours flying time froze at the controls. Massey v. United States, 198 F.2d 359 (4th Cir. 1952).

I find that the decedent did not assume the risks of this flight. Further, I conclude that the facts in this case do not warrant a conclusion that the decedent assumed the risks of this flight, as a matter of law.

### The Decedent was an Invitee.

█ The parties devoted a substantial portion of the trial time of the case to the question as to whether the decedent was a mere licensee or an invitee. The defendant contends that on the answer to this question hinges the degree of care owed to the decedent by the defendant and the quantum of negligence to be proved by the plaintiff as a prerequisite to recovery. The Federal Tort Claims Act, under which this action is brought, provides at 28 U.S.C. § 2674 that, in a tort claim action such as this, the United States "shall be liable * * * in the same manner and to the same extent as a private individual under like circumstances * * *." The claim having arisen in the State of Massachusetts, the substantive law of that state governs; the status of the decedent as an invitee or a licensee depends upon Massachusetts law. Restatement, Conflicts, § 378. Counsel have not cited nor has independent research by the court revealed any Massachusetts cases dealing with the status of persons aboard airplanes as either invitees or licensees.

This question has arisen in Massachusetts with reference to automobile passengers in private vehicles. Massachusetts law is stated definitively in a leading automobile case, Taylor v. Goldstein, 329 Mass. 161, 107 N.E.2d 14 (1952). There, the plaintiff was a passenger in the defendant's car for the purpose of being driven by the defendant to a warehouse where the plaintiff had a suitcase which he had agreed to lend to the defendant. In finding that the plaintiff was an invitee, the court, summarizing a long line of prior Massachusetts cases, stated:

"The rule deducible from these decisions is that a plaintiff acquires the status of an invitee if he is riding with the defendant for the purpose of conferring a benefit in the performance of something in which the defendant has an interest provided the benefit is other than 'those intangible advantages arising from mere social intercourse.' O'Brien v. Shea, 326 Mass. 681, 683, 96 N.E.2d 163, 165 (1951); that the benefit need not be of a pecuniary nature; and that it need not arise from a contractual relationship. * * *" Accord, Wolfson v. Fox, 338 Mass. 603, 156 N.E.2d 422 (1959).

In Wolfson, supra, it was held that the principle of the Taylor case, supra, is not rendered inapplicable to an automobile trip made not only for the benefit of the defendant but also for the benefit of the plaintiff. There the plaintiff and the defendant were business associates who were riding in a car owned and operated by the defendant for the purpose of viewing property (in which both had an interest) which had been damaged by fire. It was held that the plaintiff was an invitee within the rule laid down in the Taylor case, supra.

There are two Federal Tort Claims Act cases, decided by district courts of this Circuit, on the substantive law of New York, involving civilians aboard a military aircraft, which are worthy of mention insofar as they relate to the status of two persons aboard the same military aircraft, one of whom was held to be aboard for the purpose of conferring a benefit upon the Government, the other of whom was held to be on board for purely personal reasons. In Rogow v. United States, 173 F.Supp. 547 (S.D.N.Y. 1959), the status of the plaintiff's decedent was of importance in determining, under New York law, whether the release executed by the decedent was a bar to the plaintiff's claim. In New York such a release is a bar if the transportation of the decedent was a gratuitous benefit. And since, in New York, the plaintiff's claim based upon the New York Wrongful Death Act is derivative, the release would be a bar to a plaintiff's claim under that Act, if it were a bar to a claim by the decedent for damages had he survived.[8] In New York the test as to whether the release was a bar is not

---

8. New York Decedent Estate Law, § 130; Note 7, supra.

stated in terms of an invitee or licensee status, but rather, in terms of whether the plaintiff's decedent, at the time of the accident, was conferring a benefit upon the defendant. This test, it is to be noted, is the test by which the courts of Massachusetts determine whether one is an invitee or a licensee. Rogow was a script writer employed by an advertising agency which had a contract with the United States Air Force to produce a recruiting film. The Air Force suggested that Rogow visit various Air Force bases and that he travel mostly by military aircraft. Pursuant to the suggestion of the Air Force, Rogow boarded a B-25 at Mitchell Air Force Base destined for Wright-Patterson Air Force Base, Dayton, Ohio. The plane crashed shortly after take-off in New York State and all hands on board were killed. Before the take-off Rogow executed and delivered a release identical in form to that involved in the instant case except that it did not contain the following sentence found in the release executed by Montellier:

> "I did not receive formal training in altitude indoctrination; however, I have been thoroughly briefed on use of the equipment necessary for high altitude flight, as well as possible effects of such flights. I fully understand that I am waiving altitude indoctrination."

Since the KC-135 involved in the instant case never reached an altitude of one hundred feet above the runway at Westover Air Force Base, this portion of the release executed by Montellier has no bearing. As a practical matter, therefore, the releases in Rogow and the instant case are identical. The court concluded that the flight was not a gratuitous benefit to Rogow (an employee of a company that had a contract to produce films for the Air Force—presumably at a profit to Rogow's employer):

> "The only purpose for the trip was the gathering of material for the preparation of a script for the Air Force film. Rogow changed plans for commercial air travel and accepted the suggestion of the Air Force that he fly on its craft. He discommoded himself to suit the convenience of the Air Force. As a result of defendant's suggestion Rogow subjected himself to the dangers and discomforts of military flying to further a project of considerable interest to the Air Force. It is realistic to believe that one of the reasons for the suggestion by the Air Force that decedent travel by bomber was to provide him with an opportunity at the earliest possible moment to observe Air Force personnel in action and to thus give him a "feel" for the subject matter about which he was to write. In short, the main benefits resulting from the flight were those flowing to the Air Force. Rogow benefitted only incidentally. As a writer of considerable repute, he had an interest in producing the best possible script. But, in the main, there can be little doubt that the principal beneficiary of Rogow's military travel was the Air Force, because the trip would enable Rogow to give them a more meaningful script at an earlier date. It can hardly be said that an individual (1) traveling in furtherance of an Air Force project; (2) in a manner suggested by the Air Force and (3) whom the Air Force is in any event obligated to reimburse for his travel costs, is nevertheless the recipient of Air Force largess in the form of a "free ride." I, therefore, conclude that the flight was not a gratuitous benefit to Rogow." Rogow v. United States, supra, 173 F.Supp. at 553.

A companion case, Fass v. United States, 191 F.Supp. 367 (E.D.N.Y.1961), involved the same flight as in Rogow, supra. A retired Army officer, Maurice I. Fass, requested transportation via military aircraft for the purpose of going to the Air Force Center at Denver, Colorado, to "straighten out his records." He was permitted to board the same military plane pursuant to the authority

contained in Air Force Regulations 76–6. The court found that this journey was made by Fass "for personal reasons" and that he was a licensee, not an invitee; that the Government owed him (pursuant to New York law) the duty to exercise ordinary and reasonable care and to apprise him of any danger of which it was aware; that the Government was not liable to a licensee for a mechanical defect in the plane, not known to it, even though by inspection it or its agents might have discovered the defect; that the accident was caused by an engine failure due to an oil leak not known to the Government; that, therefore, the plaintiff could not recover.

 In Massachusetts one owes to a licensee the duty to refrain from acts constituting gross negligence.[9] An injured licensee must prove that the defendant violated this duty, i. e., that the licensee's injuries were caused by the gross negligence of the defendant, e. g., Meredith v. McLaughlin, Mass., 174 N.E. 2d 651 (1961); Holiday v. First Parish Church of Groton, 339 Mass. 692, 162 N.E.2d 48 (1959); Comeau v. Comeau, 285 Mass. 578, 189 N.E. 588, 92 A.L.R. 1002 (1934). Although the majority of Massachusetts cases state this to be the law, there is a line of cases to the effect that the only duty owed to a licensee is to refrain from wilful, wanton and reckless conduct [10] tending to injure a licensee, e. g., Baines v. Collins, 310 Mass. 523, 38 N.E.2d 626, 138 A.L.R. 1123 (1942); Romana v. Boston Elevated Railway Co., 218 Mass. 76, 82, 105 N.E. 598, L.R.A.1915A, 510 (1914); West v.

Poor, 196 Mass. 183, 185, 81 N.E. 960, 11 L.R.A.,N.S., 936 (1907). Under either of these two lines of cases, a licensee suing in Massachusetts may not recover upon proof of only ordinary negligence.

It does not follow, however that the rules of liability stated in these cases apply where the suit is brought not by the injured licensee but, rather, by the widow of a deceased licensee who sues under the non-derivative Massachusetts Death Act and in which she does not seek damages for any pain and suffering of the deceased licensee. In Gallup v. Lazott, 271 Mass. 406, 171 N.E. 658 (1930) it was held that, in an action under the Massachusetts Death Act to recover for the death of the plaintiff's intestate, "the statute 'requires proof only of ordinary negligence.'" In Shapiro v. Lyon, 254 Mass. 110, 149 N.E. 543 (1925) it was held that "although the intestate was a guest, his administratrix, in an action for death under G.L. c. 229, was bound to prove only ordinary negligence of the defendants Sughrue v. Booth, 231 Mass. 538, 121 N.E. 432 (1919); and not gross negligence of the defendants as would have been required had the action been by the intestate, or by the administratrix to recover for the conscious suffering of the intestate."

 In Massachusetts, one owes a duty to an invitee to refrain from acts or omissions which amount to ordinary negligence. Thus, the plaintiff in the instant case, suing under the Massachusetts Death Act,[11] may recover upon proof that the death of the intestate was due to ordinary negligence on the part of

---

9. Gross negligence is defined by the courts of Massachusetts as negligence that differs from ordinary or simple negligence in degree; as an indifference to a present legal duty and an utter forgetfulness of legal obligations so far as other persons may be affected. Desroches v. Holland, 285 Mass. 495, 189 N.E. 619 (1934); Szemkus v. Petrila, 299 Mass. 551, 13 N.E.2d 408 (1938); Roiko v. Aijala, 293 Mass. 149, 199 N.E. 484 (1936).

10. Wilful, wanton and reckless conduct is defined by the courts of Massachusetts as a positive act or careless omis-

sion in reckless disregard of the rights of others which exposes another to a risk of grave bodily injury. It can be established without proof of a deliberate intent to injure. All that must be shown is that the defendant acted indifferently to the consequences in such a way that the natural and probable consequence of his act was injury to the plaintiff. Baines v. Collins, 310 Mass. 523, 38 N.E.2d 626 (1942).

11. The Massachusetts Death Act, supra note 5.

the defendant, whether the intestate was a mere licensee or an invitee.

Nevertheless, I find that the plaintiff's intestate was an invitee, not a licensee. When Russia launched its first Sputnik into outer space, our government felt the need to demonstrate to the world America's technical achievements. Operation Topsail was planned by the Air Force as a demonstration of the long-range striking capabilities of its KC–135 aircraft. This type of airplane is a refueling tanker craft used mainly in support of the B–52 Bomber, the then major long-range air force weapon. The opportunity to make such a demonstration presented itself when invitations were received by the Chief of Staff of the United States Air Force from the Chiefs of the Belgian and Netherlands Air Forces, on December 9, 1957, to participate in the Liege, Belgium and Soisterburg, Netherlands International Air Meets. The invitation from the Netherlands Air Force specifically requested a demonstration of the capabilities of the KC–135. After receiving the approval of the Department of Defense and the Department of State, the Air Force accepted the invitations. Thereupon, the project entered the planning stage in which various members of the Air Force staff participated, including representatives of Information Services, Operations and Materiel. The resulting plan was submitted to and approved by the Air Force Chief of Staff. The State Department was anxious to counteract the unfavorable publicity the United States had received because of the Russian Sputnik satellite; desired publicity which would portray the United States defense effort in a more favorable aspect. In accord with this desire, speed runs to Buenos Aires and Tokyo were made by KC–135s. It was decided that the Liege Air Show would be the occasion for the European world class event in this series of record flights. Since the Eighth Air Force was the only air force equipped with KC–135s and had made the Buenos Aires and Tokyo flights, it was designated to conduct Operation Topsail. Westover Air Force Base being headquarters of the Eighth Air Force and one of the only two air force bases equipped with KC–135s, it was decided that the flights should originate from Westover Field. Operation Topsail contemplated flights by four KC–135s—two of which were to fly non-stop from Westover Field to London in an attempt to establish a transatlantic speed record; two of which were to fly from Westover Field (non-stop, non-refueling) to London and return to Westover and to Friendship Airport, Baltimore, Maryland, respectively.

Final approval of Operation Topsail had to be obtained from the Department of Defense. The Chief of Staff of the Air Force submitted the proposed plan to the Department of Defense. A directive of that Department required that, before final approval of speed runs may be given by the Assistant Secretary of Defense for Public Affairs, an advisory committee (composed of the Assistant Secretary of Defense for Public Affairs and two representatives of each of the armed services) must pass upon the plan. After the advisory committee gave its approval to Operation Topsail, the Deputy Assistant Secretary of Defense for Public Affairs referred the proposed plan to the Defense Department Operations Coordination Board in order to ensure that the flight was in the national interest and not merely in the interest of a particular service. Following approval of Operation Topsail by this Board, the Deputy Assistant Secretary of Defense for Public Affairs gave his approval on June 24, 1958, thus authorizing the Air Force to proceed with the planned flights.

To the operations plan submitted to the Department of Defense for approval was appended an information plan. The operations plan itself stated that "there is a continuing obligation on the part of the United States Air Force to demonstrate United States Air Force capabilities to the general public from time to time. This action contributes immeasurably to public confidence in its armed forces as well as the peace of mind and sense of security of the citizens of the nation."

The information plan stated that "maximum publicity consistent with public interest and within command resources is desired on all record results. * * * The Director of Information Services, Office of the Secretary of the Air Force, will actively participate in publicizing these events. * * * Every effort should be made to attract grass roots attention. Home-town releases, local and regional radio and TV interviews and other devices of promoting local interest will be pursued to the fullest extent."

That favorable publicity was the major objective of Operation Topsail is borne out by the fact that the offices and divisions of the governmental agencies most concerned with planning these flights have publicity as their major function. Thus, the Air Force Office of Information Services, the agency most concerned with planning these flights, has as one of its major functions the collecting, analyzing and disseminating to the public, unclassified information pertaining to the Air Force and its activities, based upon the principle that the full record of the Air Force should be available to the American people and that the Air Force has a responsibility to report to them. A.F.R. 190–6, December 6, 1957. The theme of publicity was carried on by the Defense Department's handling of Operation Topsail through its Under-Secretary for Public Affairs, whose office has as its basic functions to keep the public informed and to provide liaison and cooperation with information media representatives. Department of Defense Directive No. 5122.5, August 17, 1957. Colonel Henson, attached to the Office of Information Services, testified that, in light of the primary publicity purpose of Operation Topsail, the Air Force desired as great a world-wide press coverage as was possible; indeed, the Air Force wanted the press on the planes and, to that end, provided communications equipment on board which would have enabled the newspaper reporters on board to file their stories while the planes were in flight.

It was necessary to obtain the approval of the Defense Department to permit newsmen to go on the flights. The Department's Directive No. 5435.1, September 19, 1952, prohibits the furnishing of military transportation between the United States and overseas areas except in the unusual circumstances enumerated therein. These include a trip "to report a matter of special interest to the Department;" instances in which "The military travel itself is a vital part of the story or stories to be covered;" instances in which "The proposed coverage is of unusual importance to the defense establishments and will bring extraordinary benefits to one or more of the Departments." The Air Force submitted to the Department of Defense a request to permit "twelve media representatives" to make the flights in which it stated "Names of proposed invitees will be submitted to your office as soon as they are selected" and "it is anticipated that the resulting coverage will aid in fully acquainting the public of the United States and the world with our ability to send jet tanker aircraft in speedy high altitude and long distance flights to strategic points in the world in support of jet bombers on strategic missions. . . . It is requested that an exception to the general O. S. D. travel policy, D. O. D. Directive No. 5435.1, dated 19 September 1952, be made for these flights." Both the flights and permission to have newsmen aboard were approved by the Department of Defense on June 24, 1958.

Mr. Flint Du Pre, a civilian employee in the Air Force Office of Information Services in the Pentagon, Washington, D. C., after being told by his superior, Colonel Henson, that there would be space for the press on board Operation Topsail, telephoned between twenty-five and thirty news media representatives to advise them that they could go on the flight. Many of these news media maintained offices in the Pentagon itself, demonstrating the concern of the Department of Defense with publicity. The press did not jump at the opportunity to participate in Operation Topsail. Only ten of the news

media so contacted eventually sent representatives to Westover Air Force Base. Further communications by the Air Force Office of Information Services succeeded in obtaining a full complement of news representatives, one of whom was the plaintiff's intestate. The interest of the Air Force in having newsmen on board is further supported by their treatment at Westover on the day of the flight. An officer was specifically directed to receive them; they ate at the officers' mess; they attended three briefing sessions, two of which were designed to provide them with information which would facilitate their news articles; they were present at and observed the entire final crew briefing; they attended a special news story briefing at which each of them received a specially prepared press kit containing background information not readily available.

The Government discounts the significance of all of the facts relating to Air Force desire for publicity and what was done in pursuance thereof and maintains that the status of the plaintiff's intestate should be determined solely by the form of the travel authorization that was issued to him at Westover on the day of the flight. An Air Force regulation known as AFR 76-6 authorizes non-reimbursable travel for "representatives of information media (i. e., press, radio, news, and so forth) on assignments to cover military events upon approval from the department concerned." Another Air Force regulation, known as AFR 76-32,

April 21, 1954, provides that, although transportation to and from overseas areas at government expense will not be generally furnished by the Air Force for information media correspondents, an exception may be made by the Office of the Secretary of the Air Force when travel is of primary official concern to the Air Force. Such exceptions may be made, *inter alia*, "when a correspondent or a group of correspondents is desired on a trip to report on a matter of special interest and unusual importance that will bring extraordinary benefits to the Air Force" or "when the military travel itself is a vital part of the story or stories to be covered." This regulation authorizes the issuance of two kinds of travel orders once a determination is made that such transportation comes within one of the exceptions enumerated in the regulation. One type is known as "a transportation authorization, prepared in accordance with AFM 10-3." The other is described as "an invitational order, prepared in accordance with AFM 40-10." There was issued to all of the newsmen (including the plaintiff's intestate and five others who boarded the ill-fated KC-135) who were to board the planes Special Order Number C-420, dated June 26, 1958.[12] It is not denominated either as a transportation authorization as per AFM 10-3 or an invitational travel order as per AFM 40-10. But it uses the phrase "are authorized to travel" rather than "are invited to travel." The wording of an invitational order uses the lat-

12. "HEADQUARTERS
EIGHTH AIR FORCE (SAC)
United States Air Force
Westover Air Force Base,
Massachusetts
"SPECIAL ORDERS)
NUMBER C-420) 26 June 1958
"The following named individuals, addresses indicated, are authorized to travel from Westover Air Force Base, Massachusetts to London, England and return to New York Naval Air Station, New York NY or Friendship International Airport, Baltimore, Maryland during the period 26 June 1958 and 28 June 1958 for purpose of participating in Operation Top Sail. Changes in above

itinerary authorized to proceed to such additional places as may be necessary for the accomplishment of the mission. Immunizations in accordance with AFR 160-102 will be accomplished at earliest practicable date prior to departure. Immunizations may be obtained at the nearest Armed Service Hospital or Dispensary. Travel is necessary in the military service and is authorized under the provisions of AFR 76-6 or 76-15, as applicable, at no expense to the United States Government. Non-revenue traffic. Authority: Verbal orders of Director of Information Services Headquarters USAF, 26 June 1958."

ter.[13] The parties agree that the authorization issued to plaintiff's intestate was prepared as per AFM 10–3. It is to be noted that the authorization certifies that the travel was "for purpose of participating in Operation Top Sail," was "necessary in the military service" and that this authorization was issued pursuant to the following authority: "Verbal orders of Director of Information Services Headquarters USAF, 26 June 1958."

The defendant contends that, since a "transportation authorization" was issued to plaintiff's intestate, he thereby became a mere licensee; that, had an invitational travel order been issued to him, he would have become an invitee. Colonel Elsey, Chief of the Passenger Section, Director of Transportation Headquarters, U.S.A.F., testified that his office prescribed all of the regulations of the Air Force dealing with transportation; that there is no specific requirement that members of the press receive only transportation authorizations; that an invitational order would have been equally appropriate under the circumstances of Operation Topsail; that, on other occasions, his office had issued invitational orders to members of the press including the instance when newsmen traveled on military aircraft to Chile in order to report on American aid to earthquake victims. Moreover, according to this witness, under the circumstances of Operation Topsail not even a transportation authorization could be issued to newsmen unless some governmental interest was involved and the Government received some benefit from the travel.

 The plaintiff's intestate was aboard the plane for the purpose of conferring a benefit upon the defendant. The authorization to travel, issued by the defendant, likewise stated that he was aboard for that purpose. I find that he was an invitee according to the law of Massachusetts, the place where the plaintiff's claim arose.

### Flight "Coco"

#### (The Pilots)

Of the four planned flights, the flight of the KC–135 which crashed on take-off was designated "Coco". (The first two flights, which took place without incident, were designated "Alpha" and "Beta;" the fourth flight, which was canceled after the crash of "Coco," was designated "Delta.")

The plans for "Coco" as of June 21, 1958 contemplated a take-off at 0038 E. D.T. on June 27, 1958 from runway number 23 (having a stated length of 11,600 feet) at a runway temperature of 60° F.; approximately 190,900 pounds of fuel; a gross weight at take-off of 297,000 pounds; available runway of approximately 11,400 feet; critical field length of 11,400 feet; a flap setting of 30°; a take-off speed of 173.5 knots; a ground run of 10,000 feet; Colonel Broutsas to be the pilot and First Lieutenant Sweet to be the co-pilot; Brigadier General Donald W. Saunders to be aboard as a observer, not as a pilot or co-pilot.

Colonel Broutsas and Lieutenant Sweet were rated as qualified KC–135 pilots. Brigadier General Saunders was not so rated. He had had only 5:20 hours of first pilot and 23:35 hours of co-pilot time in KC–135s. General Sweeney, Commander of the Eighth Air Force, gave direct orders to Brigadier General Saunders not to occupy either the left (pilot's) or the right (co-pilot's) seats during flight "Coco." There is nothing in the record indicating directly the circumstances which caused General Sweeney to give such a command to an obviously unqualified pilot on such a mission.

After the crash, the Air Force convened an Accident Investigation Board

13. "Each of the following is *invited* by the Secretary of the Air Force to proceed on or about 28 February 1961 from places indicated to Patrick Air Force Base, Florida, for approximately seven (7) days, for the purpose of conducting a United States Air Force TV-Newsfilm Workshop, and upon completion thereof return to places specified. * * *" (Emphasis added.) Special Orders TA–261, Department of the Air Force, Washington, D.C.

the report of which the defendant refused to make available. However, the Secretary of the Air Force did authorize the issuance of a news release which included certain "Investigative Determinations" of that Board including: "a. The flight crew on this aircraft was fully qualified in the positions *as assigned*." (Emphasis added.) Another investigation was made by a Collateral Investigation Board of the Air Force. That Board made findings including a finding that Colonel Broutsas was in the right or co-pilot seat during take-off and that this fact "resulted in an unqualified pilot occupying the left seat;" that "This was in violation of paragraph 14d(1), SAC Supplement #1 to AFR 60-16, in that: "fully qualified crew members will be assigned and occupy the crew position for which qualified, when carrying passengers: This violation of prescribed procedures was occasioned by personnel aboard the aircraft responsible for the flight." General Saunders was the only such unqualified KC-135 pilot aboard. Although Lieutenant Sweet had had fewer total flying hours than Colonel Broustas, he had had 82:20 hours of KC-135 first pilot flying time as against Colonel Broustas' 25:20 hours and was rated as a qualified KC-135 pilot. A reasonable, permissible inference is that General Saunders was in the left (pilot) seat during take-off and I so find.

Although it is standard in the United States Air Force and in all flying for the pilot to occupy the left and the co-pilot to occupy the right seat, it appears that the first pilot can perform his functions as well from the right as from the left seat. On training flights it is not unusual in the Air Force for the instructor pilot to sit in the right and the student pilot to sit in the left seat. It is to be noted, however, that flight "Coco" was not a training mission in which Colonel Broutsas was aboard to instruct either Lieutenant Sweet or General Saunders. This was an unusual mission, an unusual flight in a KC-135 at a planned gross weight equal to the maximum allowable as stated in the performance manual for this particular type of aircraft. No witness knew or had ever heard of a KC-135 take-off

from Westover comparable to that planned for flight "Coco" or comparable to this plane as it was at the start of its take-off roll. No such take-off with such an actual gross weight had been made previously from Westover. Furthermore, no KC-135 had taken off previously from Westover with a 40° flap setting.

On a KC-135 take-off, both the pilot and the co-pilot have functions to perform and it is for that reason that only qualified pilots may occupy the pilots' seats. On a flight such as "Coco," neither the pilot nor the co-pilot is aboard merely as an observer. Both have important functions to perform.

The instrument panel of the KC-135 is, to say the least, complex. It contains a double set of dials—one in front of each pilot's seat. Although the two sets of dials are not identical, it is not necessary on take-off for one pilot to look over at the set of dials in front of the other. In the center of the panel there is one set of dials which relate only to the engines and may be read by either pilot. On the KC-135, unlike its commercial version, the Boeing 707, there is no flight engineer aboard. His functions are performed by the pilots. Thus the two pilots sitting in the right and left seats, respectively, of a KC-135 perform the functions of three qualified persons aboard a Boeing 707. In addition to the double sets of dials and the center panel, there is an overhead panel. It includes the cabin pressurization system, the electrical panel, light controls for the instrument panel lights, the auto-pilot control and radio controls. The pilot cannot watch both the instrument panel in front of him and the overhead panel. The latter is observed by the co-pilot "or the man who is functioning as the co-pilot." There is only one set of engine throttles located between the pilots' seats.

In between and to the rear of the pilot's and co-pilot's seats, "Coco" was equipped with a crew instructor's seat and "set," the latter being a set of dials which are used on training flights to monitor the crew's performance. However, at this position there are no controls which the instructor may use to correct any errors

in the handling of the plane. Having found that General Saunders occupied the left pilot's seat, it is a reasonable inference that the assigned co-pilot, Lieutenant Sweet, sat at this crew instructor's position and I so find.

On a KC–135 take-off, one pilot handles the aircraft, the other watches the gauges. When the craft is at the line-up point on the runway, the pilot sets the power at full throttles while the brakes are applied. If he is satisfied that he has adequate power, the co-pilot takes over the throttles and holds the four throttles in full throttle position, as a safety precaution, during take-off. When the pilot is ready to begin the take-off ground roll, he releases the brakes and holds the controls forward as the plane runs along the runway in order to keep the nose of the plane down until the plane attains what is known as rotation speed, the speed at which the pilot eases back on the controls in order to allow the nose to lift. This speed on flight "Coco" was six knots under the take-off speed.

Along both sides of the three-hundred foot wide runway at Westover there were ten markers spaced one thousand feet apart which are referred to on take-off to determine how far the plane has run at the air speed shown on the air speed indicator. The seventh marker is seventy-three hundred feet from the beginning of the runway proper; approximately seventy-one hundred feet from the brake-release point and short of the point where the plane attains rotation speed. At this marker both pilots check their respective air speed indicators and cross check the two such indicators to guard against an error in either one of them and to be sure that they have proper air speed at this point. If the speed is satisfactory the plane continues on beyond this marker and as the plane attains a speed of six knots less than take-off speed, i. e., "rotate speed," the pilot raises the nose. As the plane attains take-off or lift-off speed the plane leaves the ground and at the appropriate speed is ready for what is termed "initial climb-out" or "initial climb." During the run up to the time the plane attains rotation speed the co-pilot takes air speed readings from the air speed indicator and calls them out to the pilot. When rotation speed is attained he calls out "rotate." After rotation, the co-pilot and the pilot look outside to check on visibility. If there is outside visibility the co-pilot watches outside for obstacle clearance while the pilot goes on instruments. If there is no such visibility, both pilots rely on the plane's instruments. On a nighttime flight, even though there is visibility, the co-pilot cross-checks his observations with the instrument panel including such a check as to air speed, rate of climb, the plane's altitude and attitude. And every flight instrument that the pilot checks on his panel the co-pilot cross-checks on his. These instrument checks and cross-checks are sounded out by both pilots as they read their respective panels.

■ Considering the functions to be performed by the pilot and co-pilot of a KC–135 on take-off and the novel and unusual aspects of the take-off on flight "Coco", I find the presence of General Saunders in a pilot's seat on this take-off to constitute negligence.

### Events Before Take-off

During all the briefings of the flight crews of all four planes the flap setting for each take-off was announced as 30°. This announcement was made at the initial crew briefing held two or three days before the flights and down to and including the final crew briefing held at 8:00 P.M. on June 26, 1958, approximately four and one-half hours before the take-off.

Throughout the early phases of the planning it was assumed that the runway temperature would be ≁60° F. at the time of take-off because of the anticipated arrival of a cold front. It was so assumed on June 21, 1958 and on down to and including 0030 on June 26, 1958. During June 26th, no cold front arrived. Colonel Broutsas and Lieutenant Dziedzic, the performance engineer of Colonel Broutsas' squadron, decided to anticipate temperatures at take-off of ≁60° F., ≁65° F.

and ∤70° F. and to calculate take-off data accordingly. The pertinent aspects of their calculations, compared with those previously made are as follows:

| | 7/21/58 | 0030 7/26/58 | Calculations by Dziedzic and Broutsas 60° | 65° | 70° |
|---|---|---|---|---|---|
| Temperature | 60° | 60° | 60° | 65° | 70° |
| Flaps | 30° | not stated [14] | 30° | 30° | 30° |
| Gross Weight (lbs.) | 297,000 | 297,000 | 297,000 | 292,000 | 292,000 |
| Critical field length | 11,400' | 11,400' | 11,400' | 11,400' | 11,600' |
| Take-off distance | 10,000' | 10,000' | 10,000' | 9,800' | 10,050' |
| Decision point | #7 marker | not stated | #7 marker | #7 | #7 |
| Indicated take-off | 173.5[k] | not stated | 173.5[k] | .172[k] | 172[k] |

It is not clear from the record whether these calculations made by Colonel Broutsas and Lieutenant Dziedzic were made before or after the final briefing held June 26th at 8:00 P.M. At that briefing all of the take-off data was projected on a screen. No witness recalled what that data was except that it included a flap setting of 30° degrees and a contemplated take-off temperature of ∤65° F.

Temperature above ∤60° F. has an effect upon the weight-lifting capacity of a jet airplane. Expert witnesses were unanimous in their opinions that, other conditions being equal, for every rise in temperature of ∤1° F. above ∤60° F. the weight-lifting capacity of a KC–135 is reduced. The extent of that reduction, in the opinion of the performance engineer (with whom Colonel Broutsas made the three calculations enumerated above) is one thousand pounds for each degree of temperature above ∤60° F. The pilot of plane "Delta" (flight canceled because of the crash) estimated a reduction of five hundred pounds per such degree. The reduction was somewhere between these extremes.

Although it was announced at the final crew briefing that a ∤65° F. temperature at take-off time was expected, everyone appears to have been concerned with the possibility that the cold front would not arrive as anticipated and that the temperature might be higher than ∤65° F. at take-off.

Colonel Andrea (third in command of the operation) spoke to Colonel Broutsas immediately after the final crew briefing. He told him that, in view of the failure of the temperature to drop as expected, he should get the latest runway temperature from the control tower before he took off and make any final calculations required. Immediately thereafter Colonel Broutsas told Captain McDonald, the pilot of "Delta," that if the temperature went up (i. e., above ∤60° F.) he planned to burn off fuel to lighten the gross weight of his plane. The news release, based upon the report of the Air Force Accident Investigation Board, reveals that further take-off prediction calculations were made at 10:00 P.M. based upon a temperature forecast of ∤67° F., a 30° flap setting, a gross weight of 290,000 pounds and a take-off roll of 10,000 feet. Shortly before 11:00 P.M., Colonel Broutsas, then in the briefing room with Captain Castle (a KC–135 pilot), received a

14. The form from which this data is obtained did not call for the information listed as "not stated." All of the evidence in the case leads to the inference, however, that at 0030 on July 26, 1958 a take-off temperature of ∤60° F. was contemplated.

telephone call from someone not definitely identified but, most probably, General Saunders. (Colonel Broutsas addressed him as "Sir".). After referring to the Performance Manual at the page dealing with take-off by a KC–135 with a water injection system, Colonel Broutsas said "Well, Sir, we can take off on about ten thousand feet of runway with forty degree flaps." There was some further conversation not recalled by Captain Castle. When Colonel Broutsas hung up the telephone he said to Captain Castle, "Well, I talked him out of that one. He wanted to delay the take-off an hour." Captain Castle asked Colonel Broutsas if he didn't think that the use of forty degree flaps would be "tricky." Colonel Broutsas replied that he would not recommend the use of forty degree flaps but that once he got the plane "cleaned up" (flaps fully retracted after take-off) everything would be O.K. Colonel Broutsas then directed Captain Castle to compute what the ground roll of Broutsas' plane would be at ∕71° F. with a flap setting of 40°. Castle computed the same to be ninety-eight hundred feet. At 11:05 P.M. Colonel Burrell (second in command of the operation and a member of the crew of one of the planes that took off before the ill-fated take-off) talked with Colonel Broutsas. He was concerned about the possibility that the temperature at take-off would be higher than expected. Burrell and Broutsas checked the performance manual, based on a flap setting of 30 degrees, and concluded that, if the temperature at take-off was ∕70° F., the gross weight of Broutsas' plane (292,000 lbs.) would cause it to exceed the planned ground roll (10,300 ft.) and critical field length (11,700 ft.) by a small margin. To remedy this, Burrell recommended that Broutsas burn off a small amount of fuel in order to reduce the gross weight. It is to be noted that before this conversation Colonel Broutsas had talked some superior officer out of delaying the take-off for an hour and had said that he would use forty degree flaps. This was not revealed to Colonel Burrell. After 11:05 P.M. and before boarding his plane,

Colonel Broutsas visited the cabin of plane "Delta" which had the same mission and approximate weight as plane "Coco" and was to take off fifteen minutes after plane "Coco." He told Captain McDonald, the pilot of "Delta," that, if the take-off temperature was much higher than ∕65° F., forty degree flaps might have to be used. McDonald told Broutsas that he would rather use the planned flap setting of thirty degrees. To this Broutsas replied, "Go ahead, it doesn't matter. It only means three hundred feet of difference in take-off ground roll." The last person to hear Broutsas' voice was Sergeant Fay, the assistant crew maintenance chief for Broutsas' plane, who was connected to the plane by a headset radio during the starting up of the engines at the parking area. (The first engine was started up at midnight.) He heard Broutsas say "Lower flaps to forty degrees."

Planes "Alpha" and "Beta", each using thirty degree flaps and having a gross weight of approximately 241,000 pounds, took off successfully without water injection (i. e., with dry thrust) at 11:50 P. M. and 12:10 A.M., respectively. Such a dry-thrust take-off is attested by a Government expert witness to be equivalent to a wet-thrust take-off with a weight of 291,000 pounds and flaps set at thirty degrees, and I so find. (Use of water augmentation on take-off of a KC–135 increases engine performance by allowing more air into the compressor and allows use of a higher fuel flow without exceeding temperature limitations. Water augmentation was used on the take-off of plane "Coco.")

About five minutes after the take-off of each of planes "Alpha" and "Beta," radio messages from these planes were received by the control tower giving runway conditions, their ground roll and weather conditions during climb-out. This information was relayed by the tower to planes "Coco" and "Delta" which were awaiting take-off. The radioing back of such information was unusual. In this case it was requested by the tower officer, Captain Murphy, because of the high tem-

perature and high gross weights involved. At the final crew briefing the four crews had been advised that, commencing thirty minutes prior to the take-off of plane "Alpha," the tower would radio to them each $\neq 1°$ F. change in temperature and any change in the direction and velocity of the wind. Colonel Broutsas was in radio communication with the co-pilot of plane "Alpha" shortly after it took off. He asked the co-pilot how the "Alpha" take-off was and was advised that it was about normal. Broutsas' plane received its last message as to temperature from the tower within fifteen minutes of take-off.

### Pertinent Aspects of Take-off

Before reaching the actual take-off of plane "Coco," certain factors that were considered in the take-off plan require some explanation. The effect of temperature has already been discussed. Other factors, including critical field length, flap setting, ground effect, runway surface, wind and buffet remain for consideration.

### Critical Field Length

In computing take-off data, the possibility that one of the four jet engines will fail somewhere along the runway between the brake-release point and the end of the runway is taken into account. Depending upon where such an engine failure occurs, the runway (1) may be too short for a safe take-off on three engines or (2) may be too short for a safe stop or (3) may be long enough to permit the plane to continue on its ground-roll and make a safe take-off on three engines or (4) may be long enough to permit the pilot to bring the plane to a safe stop within the runway available beyond the point where the engine failure occurs. In calculating which of alternatives (1), (2), (3), and (4) will result from such an engine failure, there is taken into consideration the runway pressure altitude, temperature, the gross weight of the plane, the flap setting and the length of the runway. The calculations seek to insure that there is not a speed region where, if one engine fails, alternatives (1) or (2) may

occur; to insure that in the event of such an engine failure alternatives (3) or (4) will be available to the pilot. If it is determined that alternatives (1) or (2) may occur, the situation is called one in which the "critical field length" exceeds the length of the runway, measured from the brake-release point to the end of the runway." Under such circumstances the KC–135 performance manual recommends that the airplane be "off loaded (the gross weight reduced) until the corresponding critical field length is at least equal to the runway available." If it is determined that alternatives (3) or (4) may occur, the situation is called one in which the "critical field length" is less than or equal to the length of the runway—depending upon whether the calculation shows that the stop or take-off can occur before or at the end of the runway. Critical field length calculations do not take into consideration obstacles that must be cleared after lift-off.

The critical field length and all other take-off calculations are based upon charts and textual material contained in the KC–135 Flight Handbook hereinabove and hereinafter referred to as the manual. It was originally made up by the manufacturer, Boeing Aircraft Company (Boeing) and was published before this type plane made its first flight. The charts and textual material were based upon theoretical mathematical calculations, wind tunnel tests, and prototype flights of a plane from which the KC–135 and the 707 were later developed. The manual was revised quarterly, even before the KC–135 was manufactured. Revisions were made during the period of the testing of the plane by the manufacturer and the Air Force and revisions were made thereafter. In fact, revisions of such a manual are made throughout the life of a plane—some quarterly and some in the form of emergency technical orders as hazardous conditions are discovered. It may be said that such a manual is in a state of endless becoming. Most of the charts in the manual in evidence (dated June 5, 1958 and used in making the calculations for the take-off

of the four planes of Operation Topsail), including the critical field length charts, state that they are based on estimated data.

### Flaps

■ Flaps are a device for enlarging the wing area and thereby increasing the lift capabilities of the wings of a plane as it approaches and reaches the lift-off point. The purpose of flaps is to increase lift at slower speeds because a plane must fly at slow speed when it is taking off and landing. Flaps are designed to make wings efficient for these purposes. If runways were long enough, planes could take off without flaps (assuming no problem of tires withstanding high speed) at a higher speed and the wings would be more efficient. Slower ground run speed on take-off is also desirable in order to permit a safe stop during ground run in case of an engine failure before the "decision point," also known as the "go-no-go point." However, the moment the plane becomes airborne the flap extension creates drag (the greater the flap extension the greater the drag). As soon as the plane has attained the minimum speed and altitude prescribed in the manual at which the flaps may be retracted with safety, they are retracted in order to eliminate this drag which otherwise reduces the climb-out performance (rate of climb) capabilities of the plane. (The greater the flap setting, the greater the reduction of the rate of climb.)

A take-off with thirty degree flaps does not require a technique as critical as one with forty degree flaps. A forty degree flap take-off requires maximum performance from both the crew and the aircraft. Colonel Broutsas and those with whom he discussed the possible use of forty degree flaps knew this to be the fact. Colonel Zethren, Wing Commander of the 4050th Refueling Wing, had a tacit understanding with Colonel Broutsas that forty degree flaps would not be utilized for KC-135 take-offs. This understanding must have existed long before Operation Topsail for it related generally to the normal operations of that Wing. Flight "Coco" was no mere normal operation. The policy behind this understanding clearly seems to extend to a take-off as unprecedented and as critical as "Coco." It is reasonable to infer from the evidence that the flight personnel of this Wing were apprehensive of the use of forty degree flaps on take-off. Such a take-off was an unknown quantity at Westover, never having been previously made. Moreover, several of the charts in the manual (including climb-out) gave no data for forty degree flaps.

### Wind

The wings of airplanes are often described as airfoils. Basically, it is the speed and direction of the air flowing over the wings from their leading edge that produces the aerodynamics that cause the plane to become and to remain airborne. It is for this reason that airplanes take off up wind. Runway wind direction and velocity, therefore, are often taken into consideration in computing take-off data, including ground run and critical field length. Since wind is considered shortly before take-off, it is calculated by the pilot, not by the performance engineer of the squadron, a non-member of the crew. It is to be noted that the take-off data compiled before plane "Coco" reached the runway did not consider wind. At those times there was no reliable wind forecast available. The control tower reports wind direction and velocity to the pilot awaiting take-off. The manual directs that "When a wind is to be considered in take-off planning, an accurate value measured at the runway is desirable. If the tower reported wind velocity is used, the wind at the runway should be estimated at one-half of the tower reported wind." Wind direction may shift and wind velocity may vary considerably during a plane's take-off ground roll along a distance as great as two miles. Hence the conservative admonition of the manual to discount tower reported wind by fifty per cent, either as a safety measure or to make allowance for inaccuracies of wind velocity measurement.

In the instant case plane "Coco" was to take off from runway number 23 which is at 227 degrees. The runway reported wind direction very shortly before take-off was approximately 240 degrees, practically a head wind; the wind velocity was nine knots. Had wind velocity of 4.5 knots been considered by the pilot as a factor—in addition to the previous no-wind, ≠70° F. temperature, 30° flap setting take-off data in calculating critical field length, it would have been 11,000 feet instead of 11,700 feet as last computed by Colonel Broutsas and Colonel Burrell.

### Runway Surface

The computed take-off data for flight "Coco" assumed a dry runway. When a runway is wet the calculated critical field length is increased by two per cent but estimated ground run is not affected. If, however, there are extensive puddles on the runway, take-off ground run increases considerably. It had rained through the late afternoon and early evening of June 26th. At times the rain was heavy. The entire runway was wet but there was only one large puddle of water on the right side of the runway. It measured one hundred by one hundred-fifty feet and was from one to one and one-half inches in depth. At the final briefing the pilots were informed of this condition. It presented no problem to planes "Alpha" and "Beta" on their take-offs. There is no evidence that it presented any problem to the take-off of "Coco."

### Ground Effect

At the moment of lift-off the total drag of the aircraft is thirty-seven per cent less than at a considerable distance above the ground. This phenomenon is called "ground effect." It decreases as the plane rises. At a height of fifty feet this total drag is reduced by only seven and one-half per cent. At an altitude of one hundred feet or more the reduction is negligible. When drag is reduced the plane has more thrust available to provide additional lift, thus increasing the plane's take-off performance. If the terrain is level the ground effect is of longer duration than if the ground slopes downward, as is the case at Westover. There the terrain slopes downward beginning at a point five hundred feet from the end of the runway overrun or thirteen thousand one hundred feet from the brake-release point on runway number 23.

### (Buffet; Stall; Flap Retraction.)

An airplane can be placed in such an attitude at a given air speed that it will stall. Stall of an airplane differs from that of an automobile in that it is not due to the stall of the engines but rather of the entire plane as an airfoil. When it reaches the stall stage it is no longer producing lift. Rather, it has lost lift and proceeds to descend. There is a stage before this stall condition in which the plane, like an automobile approaching the stalling of its engine, vibrates and the control surfaces of the plane begin to lose their effectiveness. This stage is called "buffet." The pilot senses this vibration and also the fact that the controls lighten. As the plane enters this buffet stage, i. e., in initial buffet, the plane can still climb. But if the air speed continues to drop, (whether due to loss of ground effect, attitude of the plane, engine failure or otherwise) the plane will reach zero rate of climb. If the speed is further reduced, the plane will reach the stall stage, will lose altitude and continue to lose altitude unless and until the speed increases sufficiently to produce either level flight or climb.

If a plane such as a KC–135 has taken off with full throttle and with flaps extended, gets into buffet while at an altitude at which it is unsafe to reduce drag by retracting the flaps but has already retracted the landing gear, its speed can be increased only by reducing the "angle of attack", i. e., by lowering the nose of the plane so as to put it in level flight or, if a greater increase in speed is desired, in a descending flight angle. The manual recommends the beginning of flap retraction, in normal take-offs, at a minimum altitude of five-hundred feet; in an emergency caused by engine failure, this minimum altitude is stated to be two hundred and fifty feet.

When a KC–135 reaches the appropriate attitude, altitude and speed at which the pilot can retract the flaps with safety, the flap retraction is done in steps if the plane has a high gross weight. The manual specified not only minimum flap retraction altitude but also speed. "It is important that this schedule (of flap retraction speeds) be followed closely for high gross weights or at high altitudes and temperatures." If flaps are retracted below these specified speeds the plane will stall. For plane "Coco" the speeds so specified were:

| Flap Retraction | Speed | |
|---|---|---|
| From 40° to 30° | 169 | K |
| " 30° to 20° | 179.2 | K |
| " 20° to 0° | 194.6 | K |

Plane "Coco" never reached flap-retraction altitude. It may very well never have attained flap-retraction speed. Plane "Coco" took off and crashed with flaps set at forty degrees.

### The Take-off

Plane "Coco" took on its fuel sometime between 6:00 P.M. and 7:00 P.M. of June 26, 1958. Her engines were started up at midnight while the plane was in the parking area. It taxied a distance of approximately one mile and a half to the release point on the runway and took off at 12:30 A.M. of June 27, 1958. Thus its engines had been running for about thirty minutes immediately before take-off brake release. Approximately fifteen hundred pounds of fuel were used during these ground operations. At the beginning of the take-off ground run (i. e., at brake release), the gross weight of the plane was approximately 290,500 lbs.

Five hundred feet beyond the one thousand foot "overrun" (13,100 ft. beyond the brake release point) there is a small building (6 ft. in height) which contains instrument landing mechanisms and is known as the ILS Building. Twenty-five hundred feet beyond the one thousand foot overrun (15,100 ft. beyond the brake release point) there is the beginning of a line of trees (across a line in continuation of the runway), the highest of which was twenty-six feet above the level of the runway. This wooded area extends for a considerable distance.

The ground roll was slightly over ten thousand feet. The take-off appeared normal to ground witnesses, though the climb-out path was noticeably more shallow than they had observed on take-offs of KC–135s at lower gross weights. From the distinctive sound of the engines, competent experts testified that, in their opinion, water augmentation for increased take-off power was used as planned and I so find.

The plane had attained an altitude of forty to fifty feet above runway level as it passed over the ILS Building. Although there was haze and visibility of only one mile and a half on runway 23, the plane was observed to pass well over the initial tree line. Some fifteen seconds after lift-off, ground observers lost sight of the plane and its lights, due to haze, but the sound of the engines could still be heard. Approximately thirty seconds after lift-off these ground observers saw a flash of light followed immediately by a ball of fire and an explosive roar. Events immediately thereafter were referred to in the opening paragraph of this opinion. The initial tree strike therein referred to occurred while the plane was in a four degree descending attitude. Somewhere between the first and second tree strikes, the plane went into a thirty degree left bank attitude and, while in that attitude, struck treetops seven hundred feet beyond the first tree strike or approximately sixteen thousand three hundred and fifty feet beyond the brake release point; assumed an almost ninety degree left bank attitude; the left wing cut through six ¾ inch power cables, which were below runway level and which were strung along the airport side of the Massachusetts Turnpike; the left wing tip struck the ground and then the plane cartwheeled across the Turnpike. The plane was completely destroyed by fire and disintegration and death came instantly to all on board. No communication was received from the plane after it started its take-off ground run.

Subsequent investigation by the Air Force revealed and I find that: (1) the landing gear was fully retracted; (2) the flaps were set at forty degrees; (3) there had been no structural failure, in-flight fire, engine malfunction or any failures within the fuel, hydraulic or electrical systems prior to ground impact.

### The Missing Tapes

Plane "Coco" was equipped with a two-way radio communications system whereby it could send messages to and receive messages from the control tower and Rapcon (radar approach control). From the former the pilot receives permission to take off. From the latter (also located in the tower) he receives what is termed a clearance, i. e., authority to make the flight. The tower and Rapcon operate on different frequencies. Each maintains tape recordings of all communications transmitted and received. Air Force regulations require that "normal recorded material" on such tape recorders be retained for thirty days; that all original tapes which contain recorded material of aircraft accidents in which AACS facilities are involved be removed from the recorder as soon as possible, delivered to the Base Commander and "retained for a minimum of six months." AACS stands for Airway and Air Communication Service. Such a service was performing at Westover at the time of the accident. Air Force aircraft accident is defined in Air Force Regulations as "a mishap involving one or more Air Force aircraft that occurs between the time the engine is started for the purpose of commencing flight, and the time the aircraft comes to rest with engines stopped * * * and results in minor or substantial damages to or destruction of the aircraft."

The court called for the production of these tapes. They were never produced. There was a disclaimer of any knowledge as to what happened to these tapes by the attorney for the defendant and any Government witness who was questioned about them. One member of a Joint Industry-Air Force Accident Investigation Team testified. He and his associates arrived at Westover the day after the crash.

It is his testimony that he did not ask for the tapes; that, as far as he knows, no other member of the team did so; that he did not hear the tapes played back nor did anyone else to his knowledge. The report of the Air Force Accident Investigation Board was not made available either before or during the trial. In fact, efforts of the court to have it produced were resisted. The news release which followed the investigation by that Board and was authorized by the Office of Information, Secretary of the Air Force, Washington, D. C., states that "Between the time the aircraft started its take-off roll and the time of ground impact, no communication was received from the aircraft. * * *" This period of time does not include an interval of approximately forty minutes from the time when the radio of plane "Coco" was turned on and "the time the aircraft started its take-off roll."

Even the Tower Officer on duty that morning disclaims all knowledge of what happened to the tower tape. Considering the magnitude of this crash, the presence aboard of civilians, the damage to private property, the loss of life, the certainty that claims would be asserted against the Government, the novelty of the take-off— it seems passing strange that the Eighth Air Force did not take every precaution to ensure the preservation of these tapes and their availability.

### The Cause of the Accident

The plaintiff's expert advanced two theories as to the probable cause of the accident—(1) over-concentration by the pilot on the air speed indicator which lasted for a sufficient time for the aircraft to assume an undetected descent angle of sufficient magnitude to cause contact with trees; (2) the take-off of plane "Coco" was critical because its take-off speed was very close to buffet speed; the plane got into buffet at a time when it could not be brought out of buffet without crashing.

### Plaintiff's Theory 1

Plaintiff's expert places somewhat less reliance upon this theory than upon

theory 2. The Air Force Accident Investigation Board, however, determined that theory 1 was the cause of the crash. The news release, supra, states:

"d. The aircraft descent during the period that a climbout flight path should have been established is considered the result of complications in aircraft handling technique compounded by flight instrument limitations. In order to clear successfully all obstacles, the aircraft, with all its systems, and crew performance were required to be at near optimum. Since air speed is a primary consideration immediately after takeoff and with cognizance of the inherent normal errors in other flight instruments, it is considered likely that pilot concentration on the air speed instrument may well have lasted a sufficient length of time for the aircraft to assume an undetected and relatively slight (4°) descent angle. The magnitude of descent sufficient to cause contact with the trees was only approximately 60 feet as the aircraft traveled forward nearly 2000 feet from the point of highest altitude. The very short period of time from the point of becoming airborne until the first obstacle was struck by the aircraft precluded any flap retraction and final ground impact occurred with the flaps at their original 40° extension setting."

The manual is replete with references indicating that air speed is the dominant factor in a take-off such as that of plane "Coco," a fact of which the crew was fully cognizant.

"The ability of the airplane to climb out during the critical period following take-off depends on gross weight, number of engines operating, temperature and altitude. In addition, the climbout technique with thrust augmentation is necessarily different from that for normal dry thrust.

"EFFECT OF AIRSPEED

"Accelerating to the proper airspeeds during climbout is very important for jet aircraft. This is because the rate-of-climb drops off very fast at the lower airspeeds due to the lack of propeller slipstream, which in the past has been present for the propeller driven airplane."

Thus, after lift-off the manual recommends that a pilot accelerate the aircraft until a speed is attained at which initial flap retraction may be made. It also provides a reasonable speed margin for climb below initial retraction speed.

"Should the climb speed drop to where the rate-of-climb decreases very fast, airplane buffet will be encountered. While these speed margins are adequate, care should be exercised to avoid dropping below these recommended speeds. This is especially important when operating on three engines and at higher gross weights where the rate-of-climb is reduced."

As to ground effect and leveling off the manual states:

"When the airplane is flown close to the ground (less than 100 feet) the aerodynamic drag of the airplane is reduced. * * * Again, note how rapidly the rate-of-climb increases with airspeed. To benefit from this ground effect, the airplane should be leveled off immediately after becoming airborne and during gear retraction if the terrain permits. The resulting lowered drag can be utilized in accelerating to a higher airspeed."

The use of water augmentation (it lasts for only two minutes) on this take-off makes it even more probable that air speed was a dominating factor in critical climb-out.

"CLIMBOUT - WATER INJECTION WITH 670 GALLONS OF WATER

"The climbout technique with thrust augmentation is necessarily different from that for normal dry thrust; The large change in thrust available at the end of augmentation demands, for high gross weights or

altitude-temperature conditions, that the airplane be accelerated and cleaned up prior to that time. This becomes particularly important with the loss of an engine. Failure to do this could leave the airplane with little or no rate-of-climb (the thrust available for a normal dry takeoff can be held for 30 minutes and therefore does not present the same problem)."

In normal climb-out procedure,

" \* \* \* The following steps, indicated in the sketch, should be followed:

"1. Immediately after takeoff, and whether 4 or 3 engines are operative, start retracting the landing gear and accelerate at the minimum climb slope permitted by the terrain until reaching an airspeed 10 knots above takeoff airspeed.

"2. Climb at 10 knots above takeoff speed with the flaps at the takeoff setting until reaching a height 500 feet above the runway. Level off at this altitude and retract flaps per flap retraction schedule of figure A4-8. \* \* \*"

Speed is also of paramount importance on take-off and climb-out in regard to flap retraction. We have noted above the various minimum retraction speeds specified in the manual. It goes on to say:

"It is important that this schedule be followed closely for high gross weights or at high altitudes and temperatures."

The problem of making the proper move at the proper time on take-off and climb-out is intensified if the instruments do not reflect accurately and timely the air speed, altitude and attitude of the aircraft. It was a matter of common knowledge among pilots at Westover, including those aboard plane "Coco," that the air speed indicator and the altimeter on the KC–135 (the two most important instruments during take-off and climb-out), contain certain inaccuracies.

"The air flow around the airplane fuselage is affected by changes in airplane attitude, airplane configuration, and proximity of the ground (ground effect). These flow variations affect the pressure sensed at the static ports of the pitot-static system and thus may cause the airspeed indicator and altimeter to read incorrectly. This error is known as position error and the corresponding corrections to be applied to instrument readings are known as position corrections. Charts for obtaining these corrections both with and without ground effect, are presented in this Part.

"It is important to remember that during rotation the position error affecting the airspeed indicator will change, actually going from a negative correction to a positive correction. This change may result in the indicated speed at takeoff being no different than the indicated initial rotation speed, giving the illusion that the airplane is not accelerating during the rotation. It is important that the pilot understands these effects and follows the recommended procedure so that the chart takeoff distances can be realized."

The Government offered in evidence the report of a series of tests made by the Air Force after the crash to determine (on the basis of actual flights) the validity of the predicted data contained in the manual for heavy-weight take-off (240,000 to 297,000 pounds) and the feasibility of the use of forty degree flaps on such take-offs. Twenty-six hours and forty minutes were devoted to approximately forty take-offs, between July 11 and August 7, 1958, at Edwards Air Force Base, California, and Eilson Air Force Base, Alaska. The runway at California measured fifteen thousand feet with no obstacles for miles after lift-off. No evidence was offered as to the base in Alaska. This evidence was offered to establish that plane "Coco" was capable of a safe take-off (including climb-out). The court finds that the plane was so capable and that, had it been properly handled by pilots as experienced with

forty degree flap settings as those who conducted the tests and at an airport comparable to Edwards Air Force Base, this tragic accident would not have occurred. It is noted that these tests were not conducted at Westover.

This report, however, supports the view that the pilot either inadvertently or deliberately lowered the nose of the plane in order to gain indicated air speed. The report established that the ground roll predicted in the manual for a heavy gross weight, forty degree flap take-off was optimistic to the extent of from one hundred to five hundred feet at gross weights from two hundred and forty thousand pounds up—the optimism increasing as the gross weight above two hundred and forty thousand pounds increased; that the manual was optimistic as to such take-offs in regard to the distance from lift-off to an altitude necessary to clear a fifty foot obstacle by from eighteen hundred to twenty-nine hundred feet for gross weights ranging from two hundred and sixty thousand to two hundred and ninety-seven thousand pounds. The tests also revealed that one reason for this later error in the manual was due to its assumption that the landing gear (a drag inducing factor) is fully retracted ten seconds after lift-off. The tests revealed that on these heavy weight forty degree flap take-offs the pilot is not aware of the exact moment of lift-off as he is at a thirty degree flap setting; that about three to five seconds elapse before he is aware of the fact that the plane has become airborne. Thus the time interval between actual lift-off and complete landing gear retraction is twelve to sixteen instead of ten seconds. The tests also revealed that variations in pilot technique, such as a small variation from the climb schedule or a delay in gear retraction, have a substantial effect on the time required to reach a given altitude; that the manual instruction to level off as soon as possible after lift-off so as to benefit from ground effect did not take into account the fact that a drop-off in terrain at the end of the runway (as is present at Westover) will markedly decrease the ability to clear obstacles.

Thus the ground roll of plane "Coco" was longer than expected (10,000∕ instead of 9,800 feet); it took longer than expected to reach a fifty foot altitude; the actual benefit from ground effect was less than expected. Since the plane was not performing as expected, the probability is that the pilot's concentration on the air speed indicator was greater than normal. (He was using forty degree flaps for the first time and on a very heavily loaded plane.) The probabilities are that he either permitted the plane to assume a descending attitude, unwittingly, or did so intentionally to increase air speed. Having cleared the initial tree line and expecting the benefit of ground effect by leveling off or descending at a very slight angle he attempted to so increase air speed in order to improve his climb performance as soon as possible. In so doing he put the plane in an angle of descent. Whether this change in attitude of the plane was unintentional or intentional on the part of the pilot, he negligently allowed the plane to lose altitude to such an extent that he was unable to raise the nose in time to avoid striking the trees. The plane cut a forty foot area out of the first tree whose branches were from three to four inches in diameter. Pieces of the wing flaps and a cover for a flashing red light on the underside of the plane were found underneath and in the vicinity of the first tree. Pieces of wood from this tree, some charred and some uncharred, were found in the flaps and in the wreckage area of the wing. It is apparent, and I find, that after the plane struck this tree it was out of control and the crash was the inevitable consequence.

### Plaintiff's Theory 2

Under the buffet theory, plaintiff's expert opines that the immediate cause of buffet was the loss of ground effect; that once the plane went into buffet it was in a "coffin corner situation" in which, no matter what the pilot did, a crash was inevitable. Thus, if the nose were lowered to gain air speed at the low altitude at-

tained by the plane when it got into this "coffin corner situation," the plane would fly into the ground. If, on the other hand, the pilot tried to increase the rate of climb by raising the nose and increasing the angle of attack of the wings, buffet would increase, the plane would lose more altitude and strike the ground.

Although the manual recommends that the take-off altitude be held until an air speed of take-off speed plus ten knots is attained, this assumes the absence of any clearance problem on take-off. Moreover, the attitude indicator in the plane was not sufficiently accurate to reflect the actual attitude of the plane. In addition to the errors in the air speed indicator and the altimeter, noted above, there was an error of up to seven degrees in the attitude indicator, which is known as "precession error" and is due to changes in the acceleration of the plane. The greater the acceleration the greater the precession error which is reflected in the reading of the attitude indicator. Because of this inaccuracy, the test report, noted above, recommends that, during rotation, primary reliance should be placed on the air speed indicator, the attitude indicator to be used only as a reference. The pilot of plane "Coco" was aware of precession error. If the take-off attitude was not maintained as recommended but, rather, the angle of attack was increased before the air speed of take-off speed plus ten knots was attained, the plane may have lost some of the desired speed. And it is to be noted that on a full throttle take-off, loss of air speed can not be remedied by increasing engine thrust.

The plaintiff's expert based this buffet theory on his opinion that there was a mere three knot difference between the take-off and buffet speeds of plane "Coco." He assumed buffet speed at 157.7 knots and take-off speed at 161.4 knots, corrected for instrument error; a normal, not a "minimum run," take-off; a holding of take-off speed during initial climb-out instead of the manual recommended procedure of permitting the plane to accelerate to ten knots above take-off speed which can be attained with flaps

still extended if the plane is properly handled by the pilot. The plaintiff's expert arrived at his buffet theory by assuming the validity of his opinion that the take-off was a "minimum run take-off" but proceeded to opine that the buffet theory explains the crash, even assuming that the take-off was not "minimum run" but, rather, what is termed "normal." The manual discusses "minimum run take-off":

"TAKEOFF PLANNING—MINIMUM RUN TAKEOFF

"The procedure outlined in the text, TAKEOFF PLANNING—NORMAL, is the procedure recommended for all normal type operations and is specifically designed to insure adequate safety during the entire takeoff maneuver even with loss of an engine. However, the urgency of some missions may demand a reduction in the level of safety during the takeoff. This may even mean disregarding the possibility of an engine failure. In this event, the procedure outlined below may be followed. It should be emphasized that this procedure results in a lower level of performance and the loss of an engine will be extremely critical.

"1. Takeoff Speed: multipy chart values by 0.98 (figure A2–9).

"2. Ground Run: multiply chart values by 0.965 (figure A2–10).

"3. Set flaps at 40 degrees for minimum distance takeoff. Smaller flap settings will provide improved climbout capabilities and the smallest flap setting consistent with the available field length should be used."

The plaintiff's expert calculated take-off speed of plane "Coco" on a minimum run take-off at ninety-eight per cent of his calculated normal take-off speed or 157.9 knots. Calculating buffet speed, as he did, at 157.7 knots, his opinion is that on a minimum run take-off the crash was foredoomed.

The testimony does not support a finding that plane "Coco" made a "minimum run take-off." Colonel Broutsas selected

a forty degree flap setting because, using a thirty degree flap setting, he figured that the critical field length exceeded the available runway. He chose forty degree flaps for the express purpose of bringing critical field length within available runway, whereas on a minimum run take-off critical field length is disregarded. Moreover, the length of the ground roll on this take-off (slightly over 10,000 feet) exceeded what all of the evidence indicates it would have been on a minimum run take-off. Nor does the testimony support a finding that the plane got into buffet on the "normal" take-off because of decreased air speed due to loss of ground effect. There is no evidence, assuming loss of ground effect, as to the quantum of air speed attributable thereto.

### Defendant's Theory

To negate the plaintiff's claim that the crash was due to negligence on the part of the defendant, the defendant contended that the crash was due to a partial electrical failure, i. e., the failure after take-off, of the No. 1 generator which provides power, inter alia, for the landing lights, engine instruments and the water injection pumps for the left engines. There is no evidence to support this contention. With one exception, Government witnesses testified that after take-off they lost sight of the plane. None of these witnesses claimed that he lost sight of the plane because any lights went out. There was haze and only one and one-half miles' visibility on the take-off runway. General Sweeney, who had been in the tower when planes "Alpha" and "Beta" took off and who stationed himself near the end of the runway to observe the take-off of plane "Coco," was standing at or very near the lift-off point. All that he said on this point was that shortly after lift-off all the lights seemed to fade out. The news release prepared by the Office of Information, Secretary of the Air Force, referred to supra, reports the following determination by the Accident Investigation Board:

"C. It was determined conclusively that there was no structural failure, inflight fire, engine malfunction or any failures within the fuel, hydraulic, or electrical systems prior to ground impact. * * * "

I find that there was no electrical failure as claimed by the defendant.

### At What Speed Did The Plane Lift Off

We know at what air speed it was planned to lift off the plane if thirty degree flaps were to be used. That speed was calculated to be 173.5 knots. We do not know the speed that was calculated for the actual forty degree flap setting. It is apparent that great reliance was placed upon the manual during the planning of flight "Coco." It indicates that a plane of a gross weight of two hundred and ninety-two thousand pounds with forty degree flaps making a normal take-off at runway temperature of ⨏71° F. will have a take-off speed of 166 knots. However, the manual was in error as to the required ground roll to attain that speed. In fact, such a plane must make a longer run to attain it, i. e., approximately four hundred feet longer or ten thousand and two hundred feet instead of the ninety eight hundred feet calculated as the ground roll with forty degree flaps. If minimum ground run were contemplated, the plane could lift off at 162.7 knots. Since the lift-off point was in fact about ten thousand and fifty feet, it is a reasonable inference that at lift-off the air speed was somewhere between 162.7 and 166 knots—and the probability of a speed of about 164 knots is reasonable.

### The Use of 40° Flaps Constituted Negligence

Planes "Alpha" and "Beta" were not equipped with water augmentation. Although their gross weights were 242,000 pounds each, they had a weight equivalent to that of a plane using water augmentation and weighing 292,000 pounds for climb-out purposes and 287,000 pounds for critical field length purposes. Colonel Broutsas knew that these planes had taken off safely and successfully with 30 degree flaps. Plane "Delta," scheduled to take off fifteen minutes after

"Coco," had the same gross weight (within one thousand pounds) as "Coco" and the same non-stop, non-refueling, round-trip flight schedule. Colonel Broutsas knew that the pilot of plane "Delta" planned to use 30 degree flaps despite Colonel Broutsas' suggestion to him (about an hour before plane "Coco's" take-off) that he use 40 degree flaps. Further, there was an understanding between Colonel Broutsas and his Wing Commander that 40 degree flaps were not to be used on KC–135 take-offs, even on ordinary take-offs. Though he spoke with his superior officer, Colonel Burrell, after he had decided to use 40 degree flaps he did not advise Colonel Burrell of this decision. In the opinion of Government experts, he should have done so. When he told Colonel Burrell that he had computed his critical field length, using 30 degree flaps, at a distance in excess of available runway, Colonel Burrell advised him to burn off fuel to bring his critical field length within available runway. This is the manual recommended procedure:

"It is recommended that the airplane be off-loaded until the corresponding critical field length is at least equal to the runway available.

"Smaller flap settings will provide improved climb-out capabilities and the smallest flap setting consistent with the available field length should be used."

Colonel Broutsas could have burned off (off-loaded) fuel. He calculated that his critical field length exceeded available runway by one hundred feet. The plane had a fuel reserve in excess of 20,000 pounds. A fuel reserve of 16,000 pounds would have complied with Government regulations. Had he burned off fifteen hundred pounds of fuel, the critical field length would have been reduced by one hundred and twenty feet and would have been "at least equal to available runway."

Critical field length was computed on the assumption that available runway measured 11,600 feet. It totally disregarded an additional one thousand feet of "overrun" with a surface similar to that of the 11,600 feet of runway. This is an area, as the name implies, designed to allow a plane to run along the ground beyond the end of the so-called runway proper. Critical field length is concerned with available surface within which to bring a plane to a stop in the event of an engine failure during take-off ground roll. This one thousand feet of "overrun" was available for that purpose and should have been taken into consideration in calculating critical field length. Colonel Broutsas knew that a take-off with 40 degree flaps was more critical than with 30 degree flaps; that it would reduce his climb-out capabilities. He had had no experience with a forty degree flap take-off. He knew that no one else at Westover had had such experience. He himself characterized such a take-off as "tricky" and not recommended. He knew that it would be "tricky" until he "got cleaned up", i. e., until he had completed initial climb-out (had reached five hundred feet altitude and had completed full flap retraction). He knew that a cold front was anticipated and that the temperature would drop. In fact, within four hours after the crash, the temperature did drop eleven degrees. He rejected the advice of a superior officer that the take-off be delayed in anticipation of a drop in temperature.

The court finds that Colonel Broutsas was negligent in using 40 degree flaps.

*The Proximate Cause of the Crash*

██ The negligent use of 40 degree flaps on this take-off made it more critical. A safe take-off was further jeopardized by the presence of an unqualified pilot in a pilot's seat. The handling of the plane after lift-off, described hereinabove, was negligent. All of these acts of negligence were proximate causes of the crash and the death of the plaintiff's intestate.

*Damages*

██ While the Massachusetts Wrongful Death Act limits the amount of damages that can be recovered in actions brought under it to a maximum of $20,-

000,[15] dependent on the degree of fault, Mass.Ann.Laws 1955 c. 229 § 2C. Section 2674 provides that:

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

"If, however, in any case where death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof."

The Supreme Court has held that this limitation is not applicable to suits brought against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2674 to recover compensatory damages since the Massachusetts Death Act is punitive in nature. Massachusetts Bonding Co. v. United States, 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956).

 When a tort claim is against the Government is in a state whose Death Act provides for compensatory damages, the assessment of damages is made in accordance with that state's concepts of compensatory damages. Rogow v. United States, 173 F.Supp. 547 (S.D.N.Y.1959), is an example of such a situation and determination. If the claim arises in a state whose Death Act provides for only punitive damages, (i. e., Alabama or Massachusetts) the federal court must look elsewhere for the principles to be used in assessing compensatory damages pursuant to 28 U.S.C. § 2674. Hoyt v. United States, 286 F.2d 356 (5th Cir.1961) presented such a situation because the claim arose in Alabama. It was there

held that the "actual or compensatory damages, measured by the pecuniary injuries resulting from such death * *." are to be assessed in accordance with the federal law of wrongful death and that the primary sources of such principles have been developed in death actions under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 and the Death on the High Seas Act, 46 U.S.C.A. § 761.

"In the 1947 amendment (to 28 U.S.C. § 2674), Congress stated that it was establishing the standard of "actual or compensatory damages, measured by the pecuniary injuries" "in lieu" of the state standard of punitive damages. Why not take this proviso at its face value? Congress was rejecting the state measure of damages and imposing instead a federal standard to be construed according to federal law. Theretofore, when Congress had legislated on questions of wrongful death, the damages recoverable had been held to be compensatory and measured by the loss of pecuniary benefits. We refer to the Federal Employers' Liability Act and the Death on the High Seas Act. There is ample authority under these two laws on which we may easily draw to give content to the 'actual or compensatory damages, measured by the pecuniary injuries' language of the Tort Claims Act."

 The measure of damages applied under the Federal Employers' Liability Act and the Death on the High Seas Act is the same. Middleton v. Luckenbach, 70 F.2d 326, 330 (2d Cir.1934), cert. denied, 293 U.S. 577, 55 S.Ct. 89, 79 L.Ed. 674 (1934). Under the Federal Employers' Liability Act the following measure of damages has been set forth by the Supreme Court:

"The damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of

15. The Massachusetts Death Act, supra note 5.

the deceased." Chesapeake & Ohio Ry. Co. v. Kelly, 241 U.S. 485, 489, 36 S.Ct. 630, 631, 60 L.Ed. 1117 (1916).

Here it has been established that the decedent had been in excellent health. He was thirty-seven at the time of his death (born May 28, 1921) and was survived by a wife aged thirty-seven and two children aged seven and nine. The decedent was a devoted and loving father and was well thought of at his place of employment. His base pay, his gross salary (including overtime) and his business expenses for the five years preceding his death were as follows:

| Year | Weekly Base Pay | Gross Salary | Business Expenses |
|------|-----------------|--------------|-------------------|
| 1953 | | $ 9,093.83 | Unknown |
| 1954 | | 9,556.00 | $885.00 |
| 1955 | | 9,921.72 | 850.00 |
| 1956 | | 10,494.15 | 849.00 |
| 1957 | | 11,243.26 | 762.00 |
| 1958 (at time of death) | $176.50 or $9,178.50 per year | | |

His annual gross salary averaged approximately $10,000 over the five years before his death. After deducting average annual business expenses of $935 there remained, before taxes, an annual average of $9,165.00. One-fourth of this amount he spent annually on himself and the remaining three-fourths ($6,874.00) for the care, support, maintenance and welfare of his wife and children. At the time of his death, the savings account in the joint names of himself and his wife had a balance of less than $1,000.

When he married (January 31, 1948) he was a United Press International (U. P.I.) correspondent in Rome, Italy. In June 1948 he became Bureau Manager. As such he was in charge of U.P.I. news gathering throughout Italy and ran the Rome office staffed by four other American reporters and six to eight Italian personnel. He spoke Italian, French and some Spanish. Before he went to the Rome office in early 1947, he had served in London as a U.P.I. correspondent. He had been on an assignment in Paris. From London he went on an assignment of several months to Yugoslavia and from thence went to the Rome office of U.P.I. where he remained until June 1951 when he was transferred to the United States and lived at Rego Park, L. I., with his family until his death. While he served at the New York City office of U.P.I. he was primarily a reporter, in its International Department, although he frequently doubled as editor. That Department prepared, edited and dispatched news from all over the world to U.P.I. clients throughout the world. The work of a reporter in that department requires background, education and understanding of the world in general greater than that required of ordinary local reporters. During sessions of the United Nations in New York City, he was U.P.I.'s Number 1 reporter on that "beat." His ability to speak foreign languages was helpful during interviews with United Nations delegates. He wrote for U.P.I.'s overseas clientele and did it exceedingly well. He also "did news analysis on occasion," i. e., wrote background material with reference to current news. There is no direct evidence that the conditions requiring him to work overtime would continue over the course of his lifetime while a reporter or that, as he advanced in age, he would care to or be able to undertake overtime work were it available.

His prospects for advancement in U. P.I. were excellent. He was near the top level of reporters occupying a comparable position in U.P.I. and in comparable news-gathering agencies. But there were higher levels of work and salary to which he could have ascended in U.P.I. In U.P.I. and comparable organizations, editors and those at the executive level are normally recruited from the reportorial staff. The annual base pay of the editor who was Montellier's superior, at the time of the crash was approximately $10,400.

■ What constitutes fair and just compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of a deceased depends upon the facts in each given case. The main elements to be considered, as developed by the federal decisions, are: the age of the decedent, his health, habits, qualities, expectations of life and in life, earning ability, income, prospects of increase of income, the number, age, sex, situation and condition of those dependent upon him for support, and his disposition to support them, e. g., National Airlines v. Stiles, 268 F.2d 400 (5th Cir.1959); Petition of Gulf Oil Corp., 172 F.Supp. 911 (S.D.N.Y.1959); Thomas v. Conemaugh Black Lick R. R., 133 F.Supp. 533 (W.D.Pa.1955).

I find that the deceased had more than a reasonable probability of advancement in position and earnings in his chosen field. On the facts of this case, I find $12,000 a year to be the decedent's probable gross earnings over the remainder of his life span and that his probable annual business expenses would remain constant (as they had during the four years before his death, despite increases in annual gross income) at $850 per year. Thus, there would have remained annually $11,150 for his personal and his family's expenses.

■■ The question remains as to whether or not any deduction (from the annual contribution by the decedent to his family over his life expectancy, as found either by a court or a jury) should be made for income taxes which the decedent may have been obliged to pay over his life span. Where, as in this case, the Death Act of the state in which the claim arose is punitive rather than compensatory and, therefore, is silent on this point, federal law principles are to be applied. In this Circuit, the decisions which reflect the federal law principle on this point are McWeeney v. New York, N. H. & H. R. R. Co., 282 F.2d 34 (2d Cir. 1960), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), and Stokes v. United States, 144 F.2d 82 (2d Cir.1944) in which no deductions were made for income taxes. McWeeney, supra, does not go so far as to lay down an inflexible rule to be applied in all cases. "Just where the line should be drawn must be left, as so much is, to the good sense of trial judges, whether acting with a jury or without." On the facts in that case, it was held that no deduction for income taxes should be made. There a railroad yard brakeman, with an annual salary of approximately $4,800 a year, who sustained permanent injuries was awarded $87,000 by a jury. On appeal the court recognized that "There may be cases where failure to make some adjustment for the portion of a plaintiff's or decedent's earnings that would have been taken by income taxes would produce an improper result. * * " It cited as an example the case of one earning $100,000 a year as an instance in which such an adjustment might be made. It implied that there should be no deduction, however, in cases involving the lower or middle reach of the income scale.[16]

16. See Hall v. Chicago & N. W. Ry. Co., 5 Ill.2d 135, 125 N.E.2d 77, 50 A.L.R. 2d 661; Smith v. Pennsylvania R. R. Co., Ohio App., 99 N.E.2d 501 (1950); Chicago & N. W. Ry. Co. v. Curl, 178 F.2d 497, (8th Cir. 1949); compare James, Damages in Accident Cases, 41 Cornell L.Q. 583, 610–19 (1956) (courts avoid their responsibilities in failing to deduct future taxes in damage awards). The English courts hold that a deduction for taxes should be made. British Transp. Comm'n v. Gourley [1955] 3 All E.R. 796 (H.L.) (6–1 decision), 69 Harv. L.Rev. 1495 (1956).

I am of the opinion that the instant case comes within that middle reach of the income scale which calls for the application of the rule set forth in McWeeney, supra.

 Three-fourths of the annual sum of $11,150 or $8,362.50 represents the decedent's contribution to his family had he lived out his expected life span. However, under applicable federal law, in the absence of special circumstances, recovery for the monetary loss suffered by minor children is limited to the period of their minority, e. g., Gulf, Colorado & S. F. Ry. Co. v. McGinnis, 228 U.S. 173, 33 S.Ct. 426, 57 L.Ed. 785 (1913); Stark v. Chicago, N. S. & M. Ry. Co., 203 F.2d 786 (7th Cir. 1953); Thompson v. Camp, 163 F.2d 396 (6th Cir. 1947), cert. denied, 333 U.S. 831, 68 S.Ct. 458, 92 L.Ed. 1116 (1948). There was no showing of any unusual circumstances in the instant case that would justify any modification of this principle. Therefore, when the oldest of the surviving children of plaintiff's intestate reaches majority, the sum of $8,362.50, supra, must be reduced to represent the contribution for the support of the widow and youngest child only and, when the youngest child reaches maturity, this sum must be further reduced to represent the decedent's contribution for the support of the widow. Petition of Moore-McCormack Lines, Inc., 184 F. Supp. 585, 593 (S.D.N.Y.1960), aff'd sub nom. Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583 (2d Cir. 1961). Sheehan v. New York, N. H. & H. R. Co., 18 F.Supp. 635, 637 (E.D.N.Y.1937), rev'd on other grounds, 93 F.2d 442 (2d Cir. 1937), cert. denied, 304 U.S. 560, 58 S.Ct. 942, 82 L.Ed. 1527 (1938).

For the period June 28, 1958 to April 8, 1970, when the oldest child will attain her majority the amount available each year for the wife and two children would be $8,362.50. For the period April 8, 1970 to August 21, 1971, when the younger child, Peter, will attain his majority, the annual amount available for the wife and younger child would be two-thirds of $11,150 or $7,433.33. For the period during which only his widow is entitled to contribution (discussed infra), the annual amount available to her is one-half of $11,150 or $5,575.

 In order to ascertain the total sum that plaintiff's intestate could have contributed to his dependents from his probable gross earnings, we must consider his probable life span and that of his dependents. "Mortality tables are not inflexible rules which the jury must follow, but are guides to assist them in awarding realistic and reasonable damages." Renaldi v. New York, N. H. & H. R. R., 230 F.2d 841, 59 A.L.R.2d 1371 (2d Cir. 1956). Although on the trial reference was made to three different mortality tables (The American Experience Table; The Commissioner's Standard Ordinary Life Table—used only for life insurance purposes—and the Standard Annuity Table), I find that the life expectancy of plaintiff's intestate corresponds to that stated in the Standard Annuity Table; that as of the date of his death, his life expectancy was 35.61 years.

 In estimating the period to be used in calculating the length of time the decedent would have made contributions to his beneficiaries, the period most often used as a guide is the decedent's life expectancy, e. g., Thomas v. Conemaugh Black Lick R. R., 133 F.Supp. 533, 543 (W.D.Pa.1955); In re Southern S. S. Co., 135 F.Supp. 358, 361 (D.Del.1955); Padgett v. Padgett, 88 F.Supp. 630, 633 (S.D.Fla.1950). Other courts take into account the fact that although a man may live a given length of time, either due to predilection or infirmity, he may not be working until the very end of his life and use the period of his work expectancy as the base period. Petition of Moore-McCormack Lines, 184 F.Supp. 585, 592 (S.D.N.Y.1960), aff'd sub nom. Moore-McCormack Lines v. Richardson, 295 F.2d 583, 2d Cir., (1961); Starck v. Chicago & N. W. Ry. Co., 4 Ill.2d 616, 123 N.E.2d 826 (1954). There is no evidence in this case as to the work expectancy of the decedent. Since the basis of an award under the FELA and the Death on the High Seas Act is

the probable future contribution the decedent would have made to his beneficiaries, it is well settled that the age, life expectancy, and health of the beneficiaries are also to be taken into account. E. g., National Airlines, Inc. v. Stiles, 268 F.2d 400, 404 (5th Cir. 1959), cert. denied 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959); Petition of Gulf Oil Corp., 172 F.Supp. 911, 921 (S.D.N.Y.1959); Schwer v. New York C. & St. L. Ry. Co., 161 Ohio St. 15, 117 N.E.2d 696, 43 A.L. R.2d 606 (1954). After the children reach their majority, only the widow is entitled to a contribution from the decedent, see cases cited, supra. Obviously, if, after the children reach their majority, either the husband or the wife dies there can be no further contribution. This expectancy as to the period during which both the husband and wife survive may be determined by reference to the joint life expectancy mortality tables. Joint life expectancy has been held to provide an acceptable base period in federal wrongful death cases. Peterson v. United N. Y. Sandy Hook Pilots Ass'n, 17 F.Supp. 676, 681 (E.D.N.Y.1936); Louisville & N. R. Co. v. Stephens, 298 Ky. 328, 182 S.W.2d 447 (1944); Berry v. St. Louis & S. F. Ry. Co., 324 Mo. 775, 26 S.W.2d 988 (1929), cert. denied, 281 U.S. 765, 50 S.Ct. 464, 74 L.Ed. 1173 (1930); see McCormick, Damages 349–50 (1935). Accordingly the court has decided to use the joint life expectancy of the decedent and his widow as the period over which decedent's probable future contribution to his beneficiaries should be computed. I find that period of joint life expectancy to be 29.43 years as stated in the Standard Annuity Table. He would then have attained the age of sixty-six years in 1987. There is nothing to indicate that he would not have been capable of working throughout this joint life expectancy period or to indicate that his line of endeavor during that entire period would not be open to him. The period during which only the widow is entitled to contribution of $5575 annually is, therefore, the period from August 21, 1971 through 1987. This total

sum of contributions that the decedent would have made to his dependents, however, is not the measure of recoverable damages. We must ascertain the present worth of the future contributions to the support of the widow and children. In discounting to its present value the amount to be awarded an allowance must be made for the earning power of money. McCormick, Damages 305-306 (1935); Chesapeake & Ohio Ry. Co., v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916). Recent decisions of the Second Circuit Court of Appeals indicate that four per cent is the proper interest rate at which the decedent's future contributions should be discounted. Moore McCormack Lines, Inc. v. Richardson, supra; Conte v. Flota Mercante Del Estado, 277 F.2d 664, 670, (2d Cir. 1960); Alexander v. Nash-Kelvinator Corp., 271 F.2d 524, 527 (2d Cir. 1959). Of course the discount is not applied to periods antedating judgment. Conte v. Flota Mercante Del Estado, supra.

Using the foregoing analysis as a guide I find that the amount of loss of contributions suffered by the beneficiaries of Norman Montellier with amounts ascribable to periods occurring after the date of this judgment discounted at four per cent to be $138,000. This figure may be broken down as follows:

| | |
|---|---|
| Pecuniary benefits from earnings already lost (to date of judgment) | $ 29,268.77 |
| Present value of future lost benefits from decedent's earnings (discounted at 4%) | 108,731.23 |
| Total loss of contributions | $138,000.00 |

 The plaintiff contends that five per cent should be added to the amount representing decedent's contributions to his beneficiaries to provide for the cost of a commercial annuity. An essential distinction must be made between the value of an annuity at a given time as represented in annuity tables which may represent the present value of a given sum and the price at which an insurance

company would sell such an annuity. The latter figure would be higher since it includes items such as overhead, administrative expense and profit in addition to the value of the annuity. See 53 A.L.R.2d 1445 (1957); 79 A.L.R.2d 259, 275 (1961). Since the court has already awarded to the plaintiff the amount representing the present value of the future contributions the decedent would have made to his beneficiaries which is the measure of damages in federal wrongful death cases, Chesapeake & Ohio Ry..Co. v. Kelly, supra, there appears no reason why an additional five per cent should be added to this. Caldwell v. Southern Pac. Co., D.C., 71 F.Supp. 955 (1947); cf. Bartlebaugh v. Penn R. R. Co., 150 Ohio St. 387, 82 N.E.2d 853 (1948). The widow appeared in court and testified. The court found her to be a woman of far above average capabilities and intelligence. She appears fully equipped to administer her own financial affairs. Under present conditions a four per cent return may be safely secured through savings deposits or purchases of bonds or securities of equal standing. While a majority of the cases take the view that evidence of the cost of a commercial annuity is admissible in evidence, Thompson v. Camp, 163 F.2d 396 (6th Cir. 1947), cert. denied, 333 U.S. 831, 68 S.Ct. 458, 92 L.Ed. 1116 (1948); Louisiana A. R. Co. v. Mullins, 326 S.W.2d 263 (Tex.Civ.App.1959), cert. denied 361 U. S. 966, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960); Missouri, Kan., Tex. Ry. Co. v. Wright, 311 S.W.2d 440 (Tex.Civ.App. 1958); Texas & N. O. Ry. Co. v. Jacks, 306 S.W.2d 790 (Tex.Civ.App.1957); it may well be that such evidence is designed to provide a figure which may serve as a guide to juries in computing their verdicts. See Jones v. Atlantic Refining Co., 55 F.Supp. 17, 22–23, (E.D.Pa. 1944). However, nothing in any of those cases requires as a matter of law that the amount determined to represent the present value of the decedent's future contributions to his beneficiaries be increased by five per cent to allow for the purchase of a commercial annuity representing such value.

In addition to the value of the lost contributions, the plaintiff also seeks to recover, on behalf of the children, for the loss of parental care and guidance. "The deprivation [of intellectual, moral and physical training] is such as to admit of definite valuation, if there be evidence of the fitness of the parent and that the child has been actually deprived of such advantages." Michigan Central R. R. Co. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417 (1913). Mrs. Montellier testified that her husband had been a good father, spent all of his free time with his family, including vacations, and helped the children with their problems. It also appeared that the decedent had lived abroad for several years and was now a reporter assigned to cover the United Nations for U.P.I. With his experience he was well equipped to provide his children with education and guidance of considerable value to them. There is, of course, no precise mathematical formula under which the exact value of the loss of such parental guidance and training can be ascertained. But in view of the high cost of education today and the expense necessary to duplicate the quality of training which would have been furnished by the decedent for a number of years, the court finds that $15,000 per child is a reasonable award for the deprivation of parental care and guidance. Rogow v. United States, 173 F.Supp. 547 (S.D.N.Y.1959).

The plaintiff seeks compensation for funeral expenses. It is well settled that funeral expenses are not awardable under the Federal Employers' Liability Act and the Death on the High Seas Act. E. g., Dow v. Carnegie Steel Co., 165 F. 2d 777 (3d Cir. 1948); Heffner v. Pennsylvania R. R. Co., 81 F.2d 28 (2d Cir. 1936); First National Bank in Greenwich v. National Airlines, 171 F.Supp. 528 (S.D.N.Y.1958).

Thus, I find the total amount of damages sustained by the beneficiaries

of Norman J. Montellier, deceased, to be $168,000.[17]

The foregoing constitutes the findings of fact and conclusions of law of the court under Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.

Counsel fees of the attorney for the plaintiff are hereby determined and allowed in a sum equal to twenty per centum of the amount recovered by the plaintiff in this action under 28 U.S.C. § 1346 (b) to be paid out of but not in addition to the amount of the judgment award, 28 U.S.C. § 2678.

There remains the question of the apportionment of the balance of the judgment award as between the widow and the two infant children. Limited letters of administration were issued to the plaintiff by the Surrogate's Court of Queens County, New York, on July 21, 1958. Insofar as they affect this cause of action, they are subject to the limitations, restrictions and restraint specified in section 122 of the New York Surrogate's Court Act under which the plaintiff is restrained from enforcing the judgment to be entered herein until the further order of the said Surrogate.

██ The law of the place where the cause of action arose, Massachusetts, does not provide for compensatory damages. Massachusetts Bonding, supra. As to the punitive damages recoverable for wrongful death, the Massachusetts Death Act provides for apportionment thereof as follows: one-third to the widow and two-thirds to the surviving children, per stirpes. Mass.Ann.Laws C. 229 §§ 1(3), 2C. Apportionment of the judgment award to be made in this case based upon compensatory damages, therefore, should not be made in accordance with the Massachusetts Death Act. There is no federal statute governing this case which requires this court to apportion the avails of this action. It is only when there is such a statute that this court is required to make such apportionment. Rule 22, General Rules of the United States District Courts for the Southern and Eastern Districts of New York. The plaintiff is hereby directed to obtain a proper apportionment of the net award, after payment of legal fees, among the beneficiaries consistent with the terms of this opinion and the judgment to be entered thereon by application to the Surrogate's Court of Queens County, New York, pursuant to section 122 of the New York Surrogate's Act.

Settle judgment in accordance with this opinion on or before February 15, 1962.

---

17. This amount is broken down as follows:

| | |
|---|---|
| Loss of contributions | $138,000. |
| Loss of parental care and guidance | 30,000. |
| Total losses sustained | $168,000. |